# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3162

_____

| | | |
|---|---|---|
| Guinness Import Company, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Mark VII Distributors, Inc., | * | |
| | * | Appeal from the United States |
| Defendant Third-Party Plaintiff - | * | District Court for the |
| Appellant, | * | District of Minnesota. |
| | * | |
| v. | * | |
| | * | |
| Desnoes & Geddes, Ltd., | * | |
| | * | |
| Third-Party Defendant - | * | |
| Appellee. | * | |

_____

Submitted:  March 12, 1998
Filed: August 11, 1998

_____

Before BEAM and HEANEY, Circuit Judges, and KOPF,[1] District Judge.

_____

KOPF, District Judge.

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation.

Appellant Mark VII Distributors, Inc., appeals from the order granting summary judgment in favor of Appellee Guinness Import Company and dismissing Appellee Desnoes & Geddes, Ltd., for lack of personal jurisdiction. Mark VII Distributors, Inc. (Mark VII) presents three issues on appeal: (1) Did the district court err in holding that the Minnesota Beer Brewers Act did not apply to Guinness Import Company (Guinness) because Guinness was neither a "brewer" who had entered an agreement with Mark VII, nor a "purchaser of a brewer," and therefore could not terminate or fail to renew an agreement in violation of the Act? (2) Did the district court err in granting Guinness's motion for summary judgment as to Mark VII's claims for tortious interference, estoppel, and unjust enrichment? (3) Did the district court err in dismissing Mark VII's claim against Desnoes & Geddes, Ltd. (D&G) because D&G lacked minimum contacts with Minnesota? After careful consideration, we conclude the district court's decision was correct,[2] and we affirm.

## I.

### A. Background

D&G is a Jamaican brewer of beers, including Red Stripe and Dragon Stout. From 1983 to the present, D&G dealt with three different importers to import its beer into the United States. Each of the importers contracted with distributors of their choosing to distribute Red Stripe and Dragon Stout. From 1991 to 1995, D&G contracted with Labatt. In December, 1995, Guinness began to purchase and sell D&G products in America.

During the time Labatt imported D&G products, Labatt entered into a distribution agreement with Mark VII. When Guinness became D&G's importer, Guinness contracted with its current Minnesota distributor, leaving Mark VII without the right to sell the Jamaican beer.

_____

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

## B. Termination of Mark VII's Distributorship

Under the terms of the importation agreement between D&G and Labatt, either party could terminate the relationship "in the event the other party has a change in ownership pursuant to which 51% or more of the party becomes beneficially owned or controlled by a person or entity other than current shareholders." In late 1995, Labatt's parent company was purchased by Interbrew, Belgium's largest brewer. As a result of this change in ownership, D&G exercised its right to terminate Labatt as its importer. Pursuant to the agreement between Labatt and D&G, Labatt was entitled to a payment of $600,000 from D&G upon termination.

Labatt notified Mark VII that the change in Labatt's ownership had resulted in the end of Labatt's agreement with D&G; therefore, Labatt would no longer import Red Stripe and Dragon Stout for distribution by Mark VII. After notice of termination by Labatt to Mark VII, D&G appointed Guinness as its U.S. importer. Instead of selecting Mark VII, Guinness contracted with its established Minnesota distributors to distribute D&G products. D&G has no role in deciding who its importer contracts with to distribute the D&G products.

Mark VII seeks redress from Guinness and D&G for the termination of the distributorship agreement. Guinness argues that Mark VII's claim is really against Labatt since Labatt terminated Mark VII and Guinness simply declined to enter into a relationship with Mark VII. D&G argues that the court lacks personal jurisdiction and that it did nothing to Mark VII.

## C. Procedural Background

Guinness filed this declaratory judgment action against Mark VII seeking a judgment that Guinness is not liable to Mark VII under the Minnesota Beer Brewers

and Wholesalers Act (the Act)[3] for its decision not to enter into a distribution agreement with Mark VII. Mark VII counterclaimed, alleging a violation of the Act and damages stemming from claims for tortious interference with contract and prospective economic relations, promissory and equitable estoppel, and unjust enrichment. Mark VII also asserted a third-party action against D&G for violations of the Act.

The trial court granted D&G's motion to dismiss and denied Mark VII's motion for partial summary judgment. The trial court also granted Guinness's motion for summary judgment and dismissed Mark VII's counterclaims. Mark VII appeals.

## II. Discussion

### A. Standard of Review

In reviewing the district court's decision to grant summary judgment, we follow well-known rules. We have previously described those rules this way:

> In reviewing a district court's grant of summary judgment, this court applies the same standard as the district court applied, without giving deference to the court below. Osborn v. E.F. Hutton & Co., 853 F.2d 616, 618 (8th Cir.1988). A court should grant a summary judgment motion if the full record discloses that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Osborn, 853 F.2d at 618. The non-moving party must establish significant probative evidence to prevent summary judgment. Id. In addition, the court must give the benefit of all favorable factual inferences to the party opposing summary judgment. Simmons v. Diamond Shamrock Corp., 844 F.2d 517, 519 (8th Cir.1988). In a trilogy of cases, the Supreme Court established that the Rule 56 motion should

---

[3]Minn. Stat. Ann. §§ 325B.01 to 325B.17 (1995).

be interpreted to accomplish its purpose of disposing of factually unsupported claims. Also, the trial judge's function is not to weigh the evidence and determine the truth of the matter, but rather, the judge must determine whether there is a genuine issue for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); <u>Matsushita Elec. Indus. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).

<u>Johnson v. Enron Corp.</u>, 906 F.2d 1234, 1237 (8th Cir. 1990) (Beam, J.).

We emphasize that summary judgment is prohibited only when <u>material</u> facts are <u>genuinely</u> in dispute. The Supreme Court has said:

> [T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

<u>Anderson</u>, 477 U.S. at 247-48.

Courts of appeal review questions of personal jurisdiction de novo. <u>Burlington Indus., Inc. v. Maples Indus.</u>, 97 F.3d 1100, 1102 (8th Cir. 1996). When personal jurisdiction is challenged, the plaintiff has the burden of showing that jurisdiction exists. <u>Id.</u>

## B. Minnesota Beer Brewer and Wholesalers Act

Mark VII alleges violations of the Act. Guinness asserts it is not liable under the Act because it did not have an "agreement"[4] with Mark VII as defined by the Act, even

---

[4]Minn. Stat. Ann. §325B.01, subd. 2.

though Guinness is a "brewer"[5] under the Act.  Therefore, the Act does not apply to Guinness with regard to Mark VII.  Review of the parties' arguments requires this court to interpret the Act.

As explained by the Minnesota Supreme Court,

> statutory interpretation is a question of law.  The court's role is to discover and effectuate the legislature's intent.  In doing so, we construe technical words according to their technical meaning and other words according to their common and approved usage and the rules of grammar.  When the language of a statute, so construed, is unambiguous, we apply its plain meaning.  A statute is ambiguous if it is reasonably susceptible to more than one interpretation.  If the legislature's intent is 'clearly manifested by [the] plain and unambiguous language' of the statute, statutory construction is neither necessary nor permitted.

State by Beaulieu v. RSJ, Inc., 552 N.W.2d 695, 701 (Minn. 1996) (citations omitted).

Under the Act, "no brewer shall amend, cancel, terminate or refuse to continue to renew any agreement, or cause a wholesaler to resign from an agreement" unless the brewer has given notice and an opportunity to cure, has acted in good faith, and has good cause for the cancellation, termination, nonrenewal, discontinuance, or forced resignation.  Minn. Stat. Ann. § 325B.01, subd. 1 (West 1995).  A "brewer" means "every licensed brewer or importer of beer located within or without the state of Minnesota, who enters into an 'agreement' with any beer wholesaler licensed to do business into the state of Minnesota."  Minn. Stat. Ann. § 325B.01, subd. 4.  Under the Act, "agreement" means one or more of the following:

---

[5]Minn. Stat. Ann. § 325B.01, subd. 4.

(a) A commercial relationship between a licensed beer wholesaler and a licensed brewer of a definite or indefinite duration, which is not required to be evidenced in writing;

(b) A relationship whereby the beer wholesaler is granted the right to offer and sell a brand or brands of beer offered by a brewer;

(c) A relationship whereby the beer wholesaler, as an independent business, constitutes a component of a brewer's distribution system;

(d) A relationship whereby the beer wholesaler's business is substantially associated with a brewer's brand or brands, designating the brewer;

(e) A relationship whereby the beer wholesaler's business is substantially reliant on a brewer for the continued supply of beer;

(f) A written or oral arrangement for a definite or indefinite period whereby a brewer grants to a beer wholesaler a license to use a brand, trade name, trademark, or service mark, and in which there is a community of interest in the marketing of goods or services at wholesale or retail.

Minn. Stat. Ann. § 325B.01, subd. 2. Mark VII claims an "agreement" exists under subsections (b), (c), and (f).

Guinness argues it can only be liable under the Act if it terminated or failed to renew its own agreement with Mark VII. Guinness argues the Act's definition of "brewer" requires the "brewer" to have entered into an "agreement" as defined in § 325B.01, subd. 2. Since Guinness had no agreement with Mark VII, Guinness cannot be liable to Mark VII for terminating a nonexistent "agreement." We agree with Guinness.

The term "agreement" is unambiguous, and applying the plain meaning of the term, it is clear Guinness did not enter into any "agreement" with Mark VII. While

-7-

Labatt had an "agreement" with Mark VII, Guinness did not. Therefore, Guinness cannot be liable to Mark VII since it had no "agreement" with Mark VII.

Alternatively, Mark VII argues that it had an "agreement" with D&G, and Guinness is liable for terminating that "agreement." We disagree. D&G is not a "brewer" under the plain language of the statute. The Act specifically defines a "brewer" as a "licensed brewer or importer." Minn. Stat. Ann. § 325B.0l, subd. 4. And section 325.01, subd. 2, refers to "brewers" who have entered into "agreements." The evidence is undisputed that D&G is not a "brewer" as defined in subdivision 4 because it is not licensed in Minnesota. Consequently, applying the plain meaning of the unambiguous terms "brewer" and "agreement," Mark VII could not have had an "agreement" with D&G that is enforceable against Guinness under the Act.

Finally, Mark VII argues that by virtue of Guinness's payment of $600,000 to D&G for importation rights, and D&G's payment of $600,000 to Labatt pursuant to the importation agreement between D&G and Labatt, Guinness "purchased" importation rights such that it is obligated under the statute to all of the terms and conditions of Mark VII's "agreement" with Labatt. The Act provides:

> the purchaser of a "brewer" as defined in sections 325B.01 to 325B.17 shall become obligated to all of the terms and conditions of the agreement in effect on the date of purchase. "Purchase", as defined for the purposes of sections 325B.01 to 325B.17, shall include, but is not limited to, the sale of stock, sale of assets, merger, lease, transfer or consolidation.

Minn. Stat. Ann. § 325B.14.

The terms "brewer" and "purchase" are unambiguous. Applying the plain meaning of those terms, there is no evidence that Guinness "purchased" Labatt, the only "brewer" who had an "agreement" with Mark VII. As a result, § 325B.14 is not

-8-

applicable to Guinness and does not obligate Guinness to maintain any agreements entered into by Labatt.[6]

## C. State Tort Counterclaims

### 1. Tortious Interference with Contract and Prospective Economic Relations

To prevail on the state law claim of tortious interference with contractual relations, Mark VII must prove that: (1) a contract existed; (2) the alleged wrongdoer (Guinness) had knowledge of the contract; (3) the alleged wrongdoer intentionally interfered with the contract; (4) the alleged wrongdoer's actions were not justified; and (5) damages were sustained as a result. Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 832 (8th Cir. 1996) (applying Minnesota law). To prevail on a claim of interference with prospective economic relations, Mark VII must prove Guinness intentionally committed a wrongful act that improperly interfered with Mark VII's prospective business. Id. at 832.

There is no evidence that Mark VII had a contract with D&G that Guinness knew about or put asunder. The lack of a contract between Mark VII and D&G is dispositive of the tortious interference claim.

---

[6]The dissent argues that Guinness purchased the importation contract that Labatt had with D&G because D&G paid Labatt $600,000 and Guinness then paid D&G $600,000. However, the undisputed facts establish that the payment by Guinness to D&G was made only after Labatt was purchased by D&G's competitor Interbrew and D&G exercised the preexisting contractual right it had with Labatt to terminate the contract between D&G and Labatt. Given these undisputed facts, we agree with the district court that it would be impossible for a reasonable fact finder to conclude that Guinness "purchased" Labatt's then terminated contract with D&G.

There is likewise no evidence that Guinness intentionally committed a wrongful act as to Mark VII. When Guinness obtained the right to distribute the Jamaican beer, it simply continued to deal with its Minnesota distributor as it had in the past. Thus, there is no evidence to indicate that Guinness interfered with Mark VII's prospective economic relations.

## 2. Promissory or Equitable Estoppel

To prevail on the state law claim of promissory estoppel, Mark VII must establish that: (1) there was a clear and definite promise (2) which the promisor intended to induce reliance and reliance was induced (3) and the promise must be enforced to prevent injustice. Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995). To prevail on the claim of equitable estoppel, Mark VII must show that Guinness made representations or inducements upon which Mark VII reasonably relied that will cause Mark VII harm if estoppel is not applied. Bethesda Lutheran Church v. Twin City Constr. Co., 356 N.W.2d 344, 349 (Minn. Ct. App. 1984). Mark VII has not established the existence of any promises made by Guinness which were intended to induce reliance by Mark VII. The expansion of Mark VII's business in order to distribute D&G products was undertaken in reliance upon the distribution agreement with Labatt. Since Labatt supplied D&G products to Mark VII prior to Labatt's termination of the distribution agreement, Mark VII had never relied on Guinness to supply the product. Because Mark VII has not established the existence of any promises, representations, or inducements made by Guinness, an essential element of the estoppel claims is absent.

## 3. Unjust Enrichment

To prevail on the state law claim of unjust enrichment, Mark VII must establish that Guinness knowingly received something of value it was not entitled to and under circumstances that would make it unjust to keep. Southtown Plumbing, Inc. v. Har-

Ned Lumber Co., Inc., 493 N.W. 2d 137, 140 (Minn. Ct. App. 1992). After acquiring the right to import D&G products, Guinness could legally contract with the distributor of its choice. Guinness did nothing "unjust" by contracting with a distributor other than Mark VII. Mark VII's failure to establish that Guinness received something of value it was not entitled to is dispositive of Mark VII's unjust enrichment claim.

### D. Motion to Dismiss for Lack of Jurisdiction

The trial court dismissed Mark VII's claims against D&G for the reason that the court was unable to assert personal jurisdiction over D&G. In determining whether the Minnesota court had personal jurisdiction over a nonresident defendant, we must ask (1) whether the Minnesota long-arm statute was satisfied, and (2) whether the exercise of jurisdiction over D&G would violate the Due Process Clause of the Fourteenth Amendment. Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co., 63 F.3d 694, 696-97 (8th Cir. 1995), cert. denied, 516 U.S. 1184 (1996).

Minnesota's long-arm statute, Minn. Stat. Ann. § 543.19 (West 1988), has been interpreted to extend jurisdiction over nonresident defendants to the fullest degree allowed by the Due Process Clause of the United States Constitution. Trident Enter. v. Kemp & George, 502 N.W.2d 411, 414 (Minn. Ct. App. 1993). Thus, constitutional limits will dictate whether jurisdiction over D&G is proper.

In order to exercise personal jurisdiction over a nonresident defendant, due process requires that such a defendant have "minimum contacts" with the forum state such that maintenance of a suit against that defendant does not offend "'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). The nonresident defendant's conduct and connection with the forum state must be such that "he should reasonably anticipate being haled into court there," World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980), and it is essential that

"'there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "Purposeful availment" means that the defendant's contacts with the forum state must not be random, fortuitous, attenuated, or the result of unilateral activity of a third person or another party. Id.

Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, such contacts must be analyzed in light of other factors to determine whether the exercise of personal jurisdiction over the nonresident defendant comports with "fair play and substantial justice." Id. at 476. The factors, as articulated by the Eighth Circuit Court of Appeals, are: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." Burlington Indus., 97 F.3d at 1102.

With regard to the third factor, if specific jurisdiction is asserted, as it is here, "due process is satisfied if the defendant has purposely directed its activities at forum residents, and the litigation results from injuries arising out of, or relating to, those activities." Id. at 1103. The fourth and fifth factors are of secondary importance and not determinative. Land-O-Nod Co. v. Bassett Furniture Indus., Inc., 708 F.2d 1338, 1340 (8th Cir. 1983). In applying these factors, the central inquiry is the "'relationship among the defendant, the forum, and the litigation.'" Id. (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

## 1.  Activities in Minnesota

Jurisdiction exists if a party conducts business in the forum state in a continuous and systematic manner.  Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984).  There was no evidence before the trial court to establish that D&G did anything in Minnesota.  For example, no evidence indicated D&G was licensed to do business in Minnesota; that it maintained a bank account, phone number, or mailing address in Minnesota; that it owned property in Minnesota; or that it maintained any employees or agents for service of process in Minnesota.  Furthermore, there was no evidence that D&G exercised control over the distribution of its products in the United States or controlled the importer's decisions as to distribution.  All distributorship decisions were made by the distributor and the importer, not D&G.  Indeed, it was up to the importer whether it desired to do business in Minnesota.  The trial court was correct in refusing to attribute the Minnesota contacts of the distributor and importer to D&G since D&G played no part in directing those activities.  Digi-Tel Holdings, 89 F.3d at 524 (in evaluating contacts, the court may consider contacts with the forum state which were made by others on behalf of a party when the party has directed those activities).  In short, Mark VII failed to establish minimum contacts by D&G in Minnesota.

## 2.  Activities Directed at Minnesota

Mark VII argues that when D&G sold its beer for distribution in America, it must have known and intended that the beer would find its way to Minnesota.  Thus, by placing the beer in the "stream of commerce," D&G directed its activities at Minnesota, and the Minnesota federal court had jurisdiction over Mark VII's dispute with D&G.  We disagree.

D&G passed title to the beer in Jamaica.  After that, Guinness selected distributors in the United States and transferred the beer to the distributors.  The beer

-13-

was then distributed in Minnesota and elsewhere through distributors chosen by the importer. D&G exercised no control over the beer, the importer, or the distributor once the beer left Jamaica. It was entirely up to Guinness whether it desired to do business with Mark VII or its regular distributor. Simply put, D&G did not purposely direct its activities at Mark VII or any other Minnesota beer distributor, and in this commercial context such a showing is necessary for the Due Process Clause to be satisfied. See, e.g., Burlington Indus., 97 F.3d at 1103 (in a trade secret misappropriation case, the "non-resident" must have "purposely directed its activities at forum residents"); Falkirk Mining Co. v. Japan Steel Works, Ltd., 906 F.2d 369, 376 (8th Cir. 1990) (Due Process Clause was violated when Japanese manufacturer of specially built cams was sued by a mining company in North Dakota; manufacturer made the cams for a contractor who in turn installed the cams in a dragline constructed in North Dakota; one of the cams cracked causing damage to the dragline; the court stated: "[P]lacement of a product into the stream of commerce, without more, does not constitute an act of the defendant purposefully directed toward the forum state.") (citations omitted).[7]

---

[7]We are not persuaded by the dissent's reliance upon Vandelune v. 4B Elevator Components, Unlimited, No. 97-2510, 1998 WL 345050 (8th Cir. June 30, 1998) because that case is not similar to this one. First, Vandelune involves a personal injury claim against a manufacturer as opposed to a commercial dispute between merchants as is the case here. Id. at *4. Second, in this case the undisputed facts show that title to the beer passed to the importer in Jamaica and the manufacturer D&G exercised no control over the beer, the importer or the distributor once the product began the journey to America. In short, there is no basis for concluding that the "foreign manufacturer 'pour[ed] its product[]' into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area." Id. (quoting Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 615 (8th Cir.), cert. denied. sub nom. Hosoya Fireworks Co. v. Barone, 513 U.S. 948 (1994)).

## III. Conclusion

After carefully reviewing both the facts and the law, and giving Mark VII the inferences due it, we are convinced the district court correctly granted summary judgment on the statutory claims and the state law tort claims, and correctly dismissed D&G for lack of jurisdiction. Accordingly, the district court's order is affirmed.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. Accepting the majority's statement of issues and its recitation of the standards of review, it is my view that the district court's grant of summary judgment in favor of Guinness was improper. I disagree with the majority opinion with respect to (1) its analysis of Mark VII's tortious interference claim, (2) its application of the Minnesota Beer Brewers Act, and (3) its application of Minnesota's long-arm statute.

First, Mark VII presented material evidence showing that Guinness PLC (hereinafter "Guinness"), parent of appellee Guinness Import Company (hereinafter "GIC"), purchased D&G in 1993. Mark VII also presented evidence from which a factfinder could reasonably conclude that Guinness and its subsidiaries, D&G and GIC, concocted a scheme by which GIC would gain the right to distribute Red Stripe and Dragon Stout. There is no doubt, given such reasonable findings, that a contract existed; that Guinness, GIC, and D&G knew of the contract; that they intentionally interfered with the contract to acquire the importation rights to Red Stripe and Dragon Stout in Minnesota; that their actions to take advantage of the market Mark VII created for Red Stripe and Dragon Stout without triggering the provisions of the Act were not justified; and that Mark VII sustained damages as a result. Consequently, summary judgment on Mark VII's tortious interference claim was improper.

Second, although I have no quarrel with the majority's interpretation of the Minnesota Beer Brewers and Wholesalers Act, I disagree with its application of the Act as it relates to the evidence presented by Mark VII. Mark VII provided evidence showing that D&G, upon ending its relationship with Labatt, paid Labatt $600,000. Shortly thereafter, GIC paid D&G a similar amount to obtain the right to sell Red Stripe and Dragon Stout. Within a short time, GIC also relinquished its right to import the Dos Equis brands, brewed by a Mexican brewer, and Labatt coincidentally obtained the right to import the Dos Equis brands. Based on these events, a factfinder could reasonably conclude that the arrangement between Labatt and GIC actually constituted a "purchase" of Labatt's importation contract by GIC, placing GIC in Labatt's position as it related to Mark VII. As such, GIC would be compelled to follow the strictures of the Act relating to Labatt's contract with Mark VII. Without a trial, I do not believe that we can determine whether GIC is obligated under the Act or whether it met the Act's requirements. The district court's grant of summary judgment should be reversed.

Third, the majority's application of Minnesota's long-arm statute is simply wrong. D&G did not merely place its beer "into the stream of commerce, without more" as the majority suggests. Rather, D&G contracted with a series of importers to sell D&G's beer in the United States.[8] The rule in our circuit is clear that when a foreign producer "'pour[s] its products' into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area, the manufacturer has 'purposefully reaped the benefits' of the laws of each State in that trade area for due process purposes." Vandelune v. 4B Elevator Components, Unlimited., No. 97-2510, slip op. at 7 (8th Cir. June 30, 1998) (quoting Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 615 (8th Cir. 1994)). D&G specifically provided Red

---

[8]I am convinced that a trial would produce evidence showing that D&G's importers were required to meet certain marketing and sales levels in their respective markets to maintain their importation rights.

Stripe and Dragon Stout for importation to the United States, clearly knowing that some of its beer would be sold in Minnesota. D&G purposefully reaped the benefits of the laws of Minnesota and is consequently subject to service of process under Minnesota's long-arm statute. The majority's errant application makes Minnesota's long-arm statute a mere road bump for foreign producers who need only create a shadow corporation for distribution of its products in the United States to avoid liability under any state's law. This is not the law of our circuit and should not be permitted to stand.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.