ESTATE OF Tasunke WITKO, a/k/a Crazy Horse, Seth H. Big Crow, Sr., individually and as administrator of said Estate, and the Rosebud Sioux Tribe on behalf of Seth Big Crow as administrator of the Estate and in its own right, Plaintiffs,

v.

HORNELL BREWING CO., John Ferolito and Don Vultaggio, individually and d/b/a Ferolito, Vultaggio and Sons, Defendants.

No. CIV. 00–4200.

United States District Court,
D. South Dakota,
Southern Division.

July 26, 2001.

Robert P. Wood Gough, Rosebud, Stuart P. Kaler, Gregory P. Dresser, Christina Kirk–Kazhe, Christine S. Neuhoff, Jason A. Crotty, Kimberly A. Eckhart, Morrison & Foerster, LLP, San Francisco, CA, for Plaintiff Estate of Tasunke Witko, ak/ka Crazy Horse; Seth H. Big Crow.

Eric J. Antoine, Rosebud, SD, for Plaintiff Rosebud Sioux Tribe.

Michael J. Schaffer, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

PIERSOL, Chief Judge.

Pending before the Court is the motion to dismiss for lack of personal jurisdiction filed by defendants Ferolito and Vultaggio pursuant to Fed.R.Civ.P. 12(b)(2). (Doc. 14.)

### BACKGROUND

Seth H. Big Crow, Sr., a descendant of Crazy Horse, acting as administrator of Crazy Horse's Estate, brought suit along with the Rosebud Sioux Tribe contesting the use of the Crazy Horse name by Hornell Brewing Co., doing business as Ferolito, Vultaggio and Sons, Inc., Heileman Brewing Co., Inc.[1], and John Ferolito and Don Vultaggio. The plaintiffs challenge the defendants' use of the Crazy Horse name in the manufacture, sale, and distribution of an alcoholic beverage called "The Original Crazy Horse Malt Liquor." The complaint asserts defamation, misappropriation and misuse of inheritable property rights, privacy violations, and negligent and intentional infliction of emotional distress. The complaint also alleges violations of the Indian Arts and Crafts Act, the Lanham Act, and the Federal Trademark Dilution Act of 1995. Plaintiffs seek damages, injunctive and declaratory relief. Defendants Ferolito and Vultaggio move to dismiss the complaint for lack of personal jurisdiction. Upon careful consideration of the pleadings and affidavits, the Court denies the motion.

---

1. Heileman Brewing Company was dismissed from the case after settling with plaintiffs.

In determining personal jurisdiction, the Court has considered two affidavits of Don Vultaggio and one affidavit of John Ferolito. Vultaggio is a resident of New York and Ferolito is a resident of New Jersey. They attest that they have never been personally present in South Dakota, that they have not personally or individually transacted any business in South Dakota, and that Hornell Brewing Co., doing business as Ferolito, Vultaggio and Sons, has not and does not manufacture, advertise, sell or distribute Crazy Horse Malt Liquor in South Dakota.

The Court has also considered the Declaration of Christine S. Neuhoff, submitted in opposition to the motion to dismiss for lack of personal jurisdiction. Christine Neuhoff is one of the attorneys representing plaintiffs. Exhibit A of Neuhoff's Declaration is a copy of the Affidavit of Don Vultaggio, dated December 4, 1992 which was submitted in case number CV–92–5720 (CBA), *Hornell Brewing Co., Inc. and Don Vultaggio v. Brady,* in the United States District Court for the Eastern District of New York. (Doc. 19, ¶ 2.) Vultaggio's affidavit indicates that Vultaggio and Ferolito chose the name and designed the packaging for "The Original Crazy Horse Malt Liquor," which was introduced in March 1992. (Vultaggio Affidavit at ¶¶ 4, 5, 6, 7, 14, 16, 23, 39, 43, 46, 47, 61.) Vultaggio states that "[b]oth John Ferolito and I . . . have devoted thousands of hours to the development of the Crazy Horse Malt product and its successful introduction into the marketplace." (Vultaggio Affidavit at ¶ 61.) Vultaggio said he has a personal interest in the American West, that he noticed a resurgence of popularity of products and services with a western theme and that he thought a beverage with a western theme would be successful. (*Id.* at ¶ 5.) Defendants researched the Crazy Horse name (*id.* at ¶¶ 18, 20) and then selected it for their new malt liquor in order "to celebrate a great Native Ameri-

can Chieftain as part of our introduction of a line of beers which commemorate the American West and its legends." (*Id.* at ¶ 16.)

Plaintiffs indicate that the defendants were informed that their acts were impacting South Dakota residents almost immediately following the introduction of the malt liquor. On April 22, 1992, then Surgeon General Dr. Novello gave a press conference in South Dakota during which she stated that Crazy House malt liquor showed a "lack of respect for one of the greatest chiefs and leaders of the Oglala Sioux . . . ." (Vultaggio Affidavit at ¶ 25.) Vultaggio admitted in his affidavit that the fact Dr. Novello gave her speech in South Dakota, and in the population center of the Oglala Sioux Tribe, could have heightened and exacerbated "any offense resulting from the use of the name Crazy Horse." (*Id.*) In addition, in April of 1992, defendants received letters from South Dakota Senators Tom Daschle and Larry Pressler indicating that defendants use of the name "Crazy Horse" for malt liquor was an affront to Native Americans. *See Hornell Brewing Co. v. Brady,* 819 F.Supp. 1227, 1230 (E.D.N.Y.1993) (lawsuit by Hornell Brewing Company and Don Vultaggio challenging the constitutionality of a law banning use of the name "Crazy Horse"); Vultaggio Affidavit, ¶¶ 20, 26, 27.

The Complaint alleges that in November 1992, through counsel, the descendant's family notified the defendants, through their attorney and public relations officer, of the family's objections to ongoing commercial exploitation and unconsented appropriation of the Crazy Horse name. (Complaint, ¶ 47.) On August 25, 1993, plaintiff Big Crow brought suit in the Rosebud Sioux Tribal Court contesting defendants' use of the Crazy Horse name. After litigating jurisdictional issues in tribal court, the defendants brought a challenge

to tribal court jurisdiction in federal district court in South Dakota. *Hornell Brewing Co. v. Rosebud Sioux Tribal Court,* 133 F.3d 1087 (8th Cir.1998). The Eighth Circuit ultimately held that the tribal court did not have subject matter jurisdiction over the Estate's complaint. *Id.* at 1093. Plaintiffs now bring this action in federal court.

## DISCUSSION

The determination of whether the Court has personal jurisdiction over a defendant is normally a two-step analysis. *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas S.A.,* 51 F.3d 1383, 1387 (8th Cir.1995). First, the applicable state long-arm statute, here SDCL § 15–7–2, must be satisfied and second, the Court's exercise of jurisdiction must comport with due process. *Id.* In South Dakota, the analysis collapses into one step: the due process analysis. *See Bell Paper Box, Inc. v. Trans Western Polymers, Inc.,* 53 F.3d 920, 921 (8th Cir. 1995) ("South Dakota applies its long-arm statute to the fullest extent permissible under due process"). Due process allows a Court to exercise personal jurisdiction over a non-resident defendant only if doing so is consistent with traditional notions of fair play and substantial justice and if the defendant has sufficient "minimum contacts" with the forum state. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The contacts are sufficient if the defendant "should reasonably anticipate being haled into court there," *World–Wide Volkswagen Corp.,* 444 U.S. at 297, 100 S.Ct. at 567, because he has performed " 'some act by which the defendant purposefully avails [himself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.' " *Burger*

*King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)). The inquiry is whether the defendants have directed their activities toward residents of the forum and whether the litigation arises out of those activities. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182; *Northrup King Co.,* 51 F.3d at 1387.

To evaluate personal jurisdiction under the due process clause, the Court must consider five factors: (1) the nature and quality of the defendants' contacts with South Dakota; (2) the quantity of their contacts with this state; (3) the relation of the cause of action to the contacts; (4) the interest of South Dakota in providing a forum for its residents; and (5) the convenience of the parties. *Burlington Indus., Inc. v. Maples Indus., Inc.,* 97 F.3d 1100, 1102 (8th Cir.1996); *Northrup King Co.,* 51 F.3d at 1387–88; *Land–O-Nod Co. v. Bassett Furniture Indus., Inc.,* 708 F.2d 1338, 1340 (8th Cir.1983). The latter two issues are secondary and of less importance than the first three factors. *Id.* Because the first three factors are closely interrelated, the Court may consider them together. *Id.* The Court should consider the defendants' contacts with the forum in the aggregate; the Court should look at the totality of the circumstances. *Id.* The third factor (the relationship of the cause of action to the contacts) draws a distinction as to whether the jurisdiction is specific or general. *EFCO Corp. v. Aluma Systems, USA, Inc.,* 983 F.Supp. 816, 820 (S.D.Iowa 1997). " 'Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state,' while '[g]eneral jurisdiction ... refers to the power of a state to adjudicate any cause of action involving a particular defendant, re-

gardless of where the cause of action arose.'" *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir.1994) (quoting *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir.), *cert. denied*, 510 U.S. 814, 114 S.Ct. 63, 126 L.Ed.2d 32 (1993)). *See also Burlington Indus., Inc.*, 97 F.3d at 1102–03. Where the Court considers whether it has specific jurisdiction over nonresident defendants, due process is satisfied if the defendants purposefully directed their activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities. *Wessels, Arnold & Henderson v. National Medical Waste, Inc.*, 65 F.3d 1427, 1432 (8th Cir.1995).

While the plaintiff ultimately bears the burden of proof on the issue, personal jurisdiction need not be proved by a preponderance of the evidence until trial or evidentiary hearing. *See Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir.1991). To survive the motion to dismiss, the plaintiff must make a prima facie showing of personal jurisdiction. *Id.* Where the Court does not hold an evidentiary hearing, but instead relies upon the pleadings and affidavits filed by the parties, as the Court does here, the Court must view the facts in the light most favorable to the plaintiff, the nonmoving party. *Id.* Applying this standard, the Court finds that plaintiffs have made a prima facie showing of personal jurisdiction over Vultaggio and Ferolito.

Plaintiffs claim that personal jurisdiction exists under the "effects" test of *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), because, plaintiffs allege, defendants committed intentional and tortious acts aimed at residents of South Dakota and the brunt of the harm resulting from those acts has been felt in South Dakota. The plaintiff in *Calder* was an entertainer who lived and worked in California. She brought suit in California, claiming that she had been libeled by an article written in Florida and published in the National Enquirer, a newspaper published in Florida with a large circulation in California. Two of the defendants in the case, the editor of the paper and the reporter who wrote the story, moved for dismissal for lack of personal jurisdiction on the ground that they lacked physical contacts with California. *Calder*, 465 U.S. at 784–85, 104 S.Ct. at 1484–85. The Court held that because "California [was] the focal point both of the story and of the harm suffered," *id.* at 789, 104 S.Ct. at 1486–87, "[j]urisdiction over [the defendants was] ... proper in California based on the 'effects' of their Florida conduct in California." *Id.* The Court emphasized that the defendants had not engaged in "untargeted negligence" but instead had "expressly aimed" their tortious actions at a California resident. *Id.* at 789, 104 S.Ct. at 1487. In determining that the actions were "expressly aimed" at the forum state, the Court considered the totality of the circumstances surrounding the events. *Id.* at 788, 104 S.Ct. at 1486. The allegedly libelous article "concerned the California activities of a California resident," *id.* at 788, 104 S.Ct. at 1486, and the "article was drawn from California sources." *Id.* at 798, 104 S.Ct. at 1486. The Court concluded defendants knew that the brunt of the harm would be suffered in California because they knew the plaintiff lived and worked in California and the negative effect on her reputation would primarily be felt there, and because defendants knew that the National Enquirer had a large circulation in California. *Id.* at 789–90, 104 S.Ct. at 1487. "Under these circumstances," the Court decided, the defendants "must [have] reasonably anticipat[ed] being haled into court" in California. *Id.* at 790, 104 S.Ct. at 1487.

Courts have interpreted the effects test as requiring a plaintiff to show "that the

defendant's acts (1) were intentional, (2) were 'uniquely' or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered-and which the defendant knew was likely to be suffered-there." *Zumbro, Inc. v. California Natural Products,* 861 F.Supp. 773, 782–783 (D.Minn.1994). To answer the personal jurisdiction question in the instant case, this Court was guided by *Calder* and four Eighth Circuit cases applying or discussing the *Calder* effects test. In *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384 (8th Cir.1991), the Eighth Circuit relied on the effects test to reverse the district court's holding that a South Dakota court lacked personal jurisdiction over the nonresident defendant in a trademark infringement case. *Id.* at 1391. The defendant corporation, Sportswear, argued that it had no contacts with South Dakota and that the marketing of its products in that state resulted exclusively from the unilateral actions of others. *Id.* at 1390. Plaintiff had come forward with evidence that Sportswear knowingly and intentionally infringed plaintiff's trademark and that Sportswear shipped products with the infringing mark into South Dakota. *Id.* at 1391. Noting that the facts differed from those in *Calder* and indicating that the case did not fit squarely within the effects test, the Eighth Circuit applied the effects test and held that the defendant "must 'reasonably anticipate being haled into court' " in South Dakota because the defendant's actions were "uniquely aimed at the forum state" and that "the brunt of the injury" would be felt there. *Id.* at 1391 (citing *Calder,* 465 U.S. at 790, 104 S.Ct. at 1487).

In *Hicklin Engineering, Inc. v. Aidco, Inc.,* 959 F.2d 738 (8th Cir.1992), the Eighth Circuit determined that the facts did not warrant application of the effects test to establish personal jurisdiction in Iowa. The claims of interference with prospective business advantage, interference with contractual relations, and libel arose from the nonresident defendant's act of mailing, to plaintiff's customers, letters containing allegedly defamatory statements about the plaintiff's products. *Id.* at 739. The Court found that none of the correspondence was published in Iowa and that defendant's actions were not targeted to have an effect in Iowa. The Court concluded that although promotion and solicitation may have an effect on a competitor, that effect alone is not enough to bestow personal jurisdiction. *Id.*

Next, the Eighth Circuit, relying on the reasoning in *Calder* and *Dakota Industries,* determined that personal jurisdiction was proper over a non-resident defendant, River North Records, whose publicity director sent to plaintiffs in Arkansas promotional materials for music artists who were to appear at a concert promoted by plaintiffs. *See Finley v. River North Records, Inc.,* 148 F.3d 913 (8th Cir.1998). In addition to the mail contact, River North's publicity director discussed the concert promotion several times by phone with plaintiffs. *Id.* at 915. Plaintiffs cancelled the concert after learning that one of the promoted artists would not be appearing and that one of the bands did not even exist. *Id.* Trial testimony supported plaintiffs' contention that River North knowingly misrepresented the artist's appearance and the band's existence. *Id.* at 916. The Eighth Circuit concluded that the fraudulent conduct was intended to induce commercial activity within the forum state, that the tortious conduct had foreseeable consequences, and that River North "must 'reasonably anticipate being haled into court [in Arkansas]' to answer for the truth of the statements made...." *Id.* (citing *Calder,* 465 U.S. at 790, 104 S.Ct. 1482, 79 L.Ed.2d 804).

Finally, in *Oriental Trading Co., Inc. v. Firetti,* 236 F.3d 938 (8th Cir.2001), the

defendants, residents of Virginia and directors of a Virginia corporation selling pencils and crayons, fraudulently induced plaintiff, a Nebraska corporation and defendants' customer, into paying fictitious Customs' duties to defendants with the promise that defendants would then pay the duties to Customs and that this procedure would save money for plaintiff. *Id.* at 941. Instead, defendants used the funds for normal operating expenses for their business. *Id.* at 942. Plaintiff sued defendants in Nebraska for fraud, negligent misrepresentation and conversion. *Id.* at 941. Defendants argued that they did not have sufficient minimum contacts with Nebraska because they never entered the state and only made phone calls and sent faxes into Nebraska. *Id.* at 943. Citing *Calder* and *Finley,* the Eighth Circuit concluded that by purposely directing their fraudulent communications at residents of Nebraska the defendants should have reasonably anticipated being haled into court there and that the Nebraska court appropriately exercised personal jurisdiction over them. *Id.* at 943.

The present case is more analogous to *Calder* and to *Dakota Industries* and its progeny than to *Hicklin* because this is not a case in which the sole connection between the defendants and the forum is the effects of an intentional tort. Although Vultaggio and Ferolito have never been to South Dakota and Crazy Horse Malt Liquor is not marketed in South Dakota, defendants effectively have "reached into" South Dakota by using the Crazy Horse name on liquor and proceeding to do so while knowingly impacting the descendants of Crazy Horse who are residents of South Dakota. This is not so different than the actions of the individual defendants in *Calder* who "expressly aimed" their tortious actions at a California resident knowing that the brunt of the injury would be felt by the plaintiff in California. *Calder* advises that a personal

jurisdiction question cannot be answered by application of a mechanical test, but instead courts must focus on the relationship among the defendant, the forum, and the litigation within the particular factual context of each case. *Calder,* 465 U.S. at 788, 104 S.Ct. at 1486. The Court will endeavor to apply this "test" to the facts of this case.

■ First, the Court concludes that defendants' alleged intentional actions were uniquely directed at South Dakota. Crazy Horse is the renowned and beloved leader of the Lakota Sioux who dedicated his life to protecting the cultural ways of his people and who vigorously opposed the use of alcohol by the Lakota people. (Complaint, ¶¶ 20, 23, 24.) The descendants of Crazy Horse live among the Sicangu on the Rosebud Reservation, the Oglala on the Pine Ridge Reservation, and the Miniconjou on the Cheyenne River Reservation, all located in South Dakota. (*Id.* at ¶ 26.) The descendants have honored Crazy Horse's dying wish not to have anyone disturb his body or spirit after his death by moving his body several times and re-burying him secretly. (*Id.* at ¶ 25.) The descendants have only used the Crazy Horse name in limited circumstances in honor of the sacred trust that his person, name, and spirit not be exploited. (*Id.* at ¶ 26.) For purposes of this motion the Court will assume defendants' use of the Crazy Horse name in the manufacture, sale, and distribution of an alcoholic beverage constituted the alleged acts of defamation, misappropriation and misuse of inheritable property rights, violation of privacy and intentional infliction of emotional distress, as well as violations of the Indian Arts and Crafts Act, the Lanham Act, and the Federal Trademark Dilution Act of 1995. Under these circumstances, defendants' intentional actions were uniquely aimed at South Dakota where the descen-

dants of Crazy Horse live. Some descendants of Crazy Horse must live off the reservations, but this would seem to more greatly impact the numerous more traditional descendants that still choose to live on the reservations. Having spent thousands of hours in research and development of the product and its introduction into the marketplace, the defendants had to know that their actions were uniquely aimed at residents in South Dakota.

 Second, the brunt of the harm caused by defendants' actions clearly is suffered—and defendants knew it was likely to be suffered—in South Dakota. The malt liquor bears the Crazy Horse name which the descendants of Crazy Horse, residents of South Dakota, have tried to protect from misuse pursuant to a sacred trust. The plaintiffs allege that because of defendants' actions the descendants of Crazy Horse have suffered a shameful slur in Lakota culture: "He (Crazy Horse) must be without relatives who can stand up for him at a time when they have given his name to a liquor." (Complaint, ¶ 43.) In a footnote in their Reply Memorandum in Support of Defendants' Ferolito and Vultaggio Motions to Dismiss, defendants say plaintiffs have not shown that the effect of defendants' actions has been felt in South Dakota because it is unclear what state, if any, Crazy Horse would be deemed to be a citizen and Big Crow, the administrator of the estate, is "deemed to be a citizen only of the same State as the decedent." (Doc. 22, citing 28 U.S.C. § 1332(c)(2)). This argument fails because the impact of defendants' actions is felt by the descendants of Crazy Horse who are residents of South Dakota. Defendants were informed their acts were impacting South Dakota residents almost immediately following the introduction of the malt liquor. In April of 1992, defendants received letters from South Dakota Senators Tom Daschle and Larry Pressler objecting to defendants' use of the name "Crazy Horse" for malt liquor. In November 1992 the defendants were notified by counsel for Crazy Horse's descendants that the family objected to ongoing appropriation of the Crazy Horse name. On August 25, 1993, plaintiff Big Crow brought suit in the Rosebud Sioux Tribal Court contesting defendants' use of the Crazy Horse name. After litigating jurisdictional issues in tribal court, the defendants brought a challenge to tribal court jurisdiction in federal district court in South Dakota. Defendants do not allege that the effect of their use of the Crazy Horse name on malt liquor was felt more significantly in a state other than South Dakota. As has been pointed out, defendants undoubtedly were aware of the South Dakota affiliation with the Crazy Horse name and that the brunt of the injury would be suffered in South Dakota.

Having carefully applied the *Calder* effects test to the circumstances in this case, the Court concludes that Ferolito and Vultaggio's use of the Crazy Horse name in the manufacture, sale, and distribution of an alcoholic beverage called "The Original Crazy Horse Malt Liquor" was directed at residents of South Dakota and, as a result, has affected plaintiffs, residents of this state, and defendants knew their actions would affect residents of South Dakota. The Court concludes that the defendants' connections with the State of South Dakota were such that they should reasonably have anticipated being sued in this forum.

Defendants argue that, in addition to meeting the effects test, plaintiffs must prove defendants had some other contact with the forum before the Court may properly exercise personal jurisdiction over them. Defendants' argument is misdirected because "within the rubric of 'purposeful availment' the [Supreme Court] has allowed the exercise of jurisdiction over a defendant whose only 'contact' with the

forum state is the 'purposeful direction' of a foreign act having effect in the forum state." *Haisten v. Grass Valley Medical Reimbursement Fund,* 784 F.2d 1392, 1397 (9th Cir.1986) (citing *Calder,* 465 U.S. at 789, 104 S.Ct. at 1487). Thus, although the effects test does not . replace the Eighth Circuit's five factor test for determining personal jurisdiction under the due process clause, it is one way to evaluate at least the first three factors: (1) the nature and quality of the defendant's contacts with the forum; (2) the quantity of their contacts with the forum; and (3) the relation of the cause of action to the contacts. In other words, the effects test is a method of determining whether a non-resident defendant has sufficient minimum contacts with the forum so that the exercise of personal jurisdiction is consistent with traditional notions of fair play and substantial justice.

Defendants rely on *Casualty Assurance Risk Insurance Brokerage Co. v. Dillon,* 976 F.2d 596 (9th Cir.1992), for the proposition that a nonresident defendant must have some physical contacts with the forum in order for personal jurisdiction to exist.[2] The *Dillon* court talked about the importance *Calder* placed on the fact that about 600,000 copies of the National Enquirer were circulated in California. The *Dillon* court noted that the circulation of the defamatory material in California was important not because it proved the individual defendants in *Calder* had some physical contacts with California, but because it showed the defendants knew that the brunt of their allegedly libelous story would be felt in the state where the plaintiff lived and worked. *Dillon,* 976 F.2d at 599. The *Dillon* court could not find personal jurisdiction over the defendants pursuant to the effects test because, as in

*Hicklin,* the plaintiff showed only an injurious effect in the forum, while the effects test requires proof that the defendant's actions were uniquely aimed at the forum, that the brunt of the harm was suffered in the forum and that the defendants knew it would be suffered there. The Ninth Circuit concluded in *Dillon* that the harm to a corporation from an allegedly libelous statement is not necessarily suffered in the place of incorporation and, in order to invoke personal jurisdiction over the defendant, the plaintiff needed to show more than just that it was incorporated in the forum. *Dillon,* 976 F.2d at 599–600. Unlike the plaintiffs in *Dillon,* plaintiffs in this case have come forward with allegations sufficient to meet all requirements of the effects test and to make a prima facie showing of personal jurisdiction over defendants.

▪ "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Burger King, supra,* 471 U.S. at 476–77, 105 S.Ct. at 2184. As set out by the Eighth Circuit, the factors to consider include: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." *Guinness Import Co. v. Mark VII Distrib., Inc.,* 153 F.3d 607, 614 (8th Cir.1998). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a com-

---

**2.** Defendants also rely on *Minnesota Mining and Manufacturing Co. v. Rauh Rubber, Inc.,* 943 F.Supp. 1117 (D.Minn.1996), but that case is inapposite because it does not even address the effects test.

pelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* Defendants here simply state that it is not convenient for them to have the case heard in South Dakota. (Doc. 22, p. 8.) The Court finds that the inconvenience to defendants is outweighed by the extent of the defendants' purposeful interjection into the affairs of residents of South Dakota, by South Dakota's interest in adjudicating the dispute and by the efficiency of hearing the entire case in one forum. Accordingly,

IT IS ORDERED that the motion to dismiss filed by defendants Ferolito and Vultaggio is DENIED.