ROQUETTE AMERICA, INC., a Delaware Corporation, and Roquete Freres, a French Corporation, Plaintiffs–Appellees,

v.

Laurent GERBER, a French Citizen; Amylum Belgium N.V., a Belgian Corporation; Amylum Group Services, a Belgian Corporation; Amylum France SAS, a French Corporation; Amylum SPI Europe, a French Corporation; and Carole Piwnica, a Belgian Citizen, Defendants–Appellants.

No. 00–1076.

Court of Appeals of Iowa.

June 19, 2002.

Mark Weinhardt, Mark McCormick, and Steven M. Colloton of Belin Lamson McCormick Zumbach Flynn, Des Moines, Jonathan K. Cooperman and Frank C. Di-Prisco of Kelley, Drye & Warren, New York, New York, and James P. Hoffman, Keokuk, for appellants.

Oleg Rivkin, Eric Lindquist, and Kristen D. Perrault of Fox, Haran & Camerini, L.L.P., New York, New York, and Joseph R. Gunderson and Edward C. Poulsen of Genderson, Sharp, Trout & Rhein, P.C., Des Moines, for appellees.

Heard by MAHAN, P.J., and ZIMMER and EISENHAUER, JJ.

MAHAN, P.J.

Defendants appeal the decision of the district court that denied their motion to dismiss a tort action that alleged breach of a covenant not to compete, misappropriation of trade secrets, and intentional interference with contractual relations. They claim their motion to dismiss should have been granted due to lack of personal jurisdiction and forum non conveniens. We reverse the district court.

## I. Facts

Roquette Freres (Roquette) is a French corporation which manufactures starches and starch derivatives, such as sorbitol, primarily for distribution in Europe. Roquette America, Inc. (RAI) is a Delaware corporation which is a wholly-owned subsidiary of Roquette. RAI produces starches and starch derivatives at plants in Keokuk, Iowa, and Gurnee, Illinois, for distribution in North America.

Laurent Gerber, a French citizen, began employment with Roquette in 1976. With the agreement of Roquette, in 1993 Gerber accepted the position of Vice President— Operations of RAI in Iowa for a period of

four years. Upon the request of the CEO of RAI, Robert Ireland, Gerber signed a covenant not to compete on March 15, 1994. The covenant prohibited Gerber from obtaining employment with a competitor for a period of two years after he ceased working for RAI. Gerber left his employment with RAI in September 1997 and returned to France to become Roquette's deputy technical director.

In April 1998 Gerber was contacted by a Belgian corporate recruitment firm on behalf of the Amylum Group, a group of multinational companies which also manufactures starches and starch derivatives, primarily for distribution in Europe. When an RAI employee was in France in August 1998, Gerber obtained a document that dealt with liquid sorbitol production. Gerber received the document after he had resigned from Roquette, but while he was still working there. In November 1998 Gerber began working for the Amylum Group,

## II. Decision in District Court

On March 23, 1999, RAI and Roquette filed suit in Iowa district court against Gerber; Amylum Belgium, N.V., a Belgian corporation; Amylum Group Services, a Belgian corporation; Amylum France SAS, a French corporation; Amylum SPI Europe, a French corporation; and Carole Piwnica, a Belgian citizen and chairperson of Amylum Belgium. Piwnica and the Amylum corporations together will be called the Amylum Group.

Plaintiffs raised claims against Gerber alleging breach of a noncompetition covenant, breach of a nondisclosure covenant, and breach of fiduciary duty. Plaintiffs claimed the Amylum Group had engaged in intentional interference with contractual relations and procurement of breach of fiduciary duty. Plaintiffs claimed all defendants had engaged in statutory and common law misappropriation of trade secrets and conversion. Plaintiffs' claims were based on a theory that Gerber disclosed trade secrets while employed by the Amylum Group, and that the Amylum Group used this information to advance its market position, particularly in the sale of sorbitol in the United States.

Defendants filed a motion to dismiss based on international comity, lack of personal jurisdiction, and forum non conveniens. They asserted the case should be tried in Europe, where the alleged torts occurred and where most of the witnesses lived. The district court permitted discovery in conjunction with the motion, which resulted in the filing of extensive depositions and exhibits. In addition, a four-day hearing was held on the motion.

On May 25, 2000, the district court entered a ruling denying the motion to dismiss. The district court concluded:

> A review of the facts established in conjunction with the *Defendants' Motion to Dismiss* leads this court to conclude that all three of the requirements of *Calder* exist in this suit. The defendants committed one or more intentional torts expressly aimed at this jurisdiction and the brunt of the harm is felt here. This court has personal jurisdiction over the defendants.[1]

The court also determined Iowa was not an inconvenient forum. No postruling motions were filed. Defendants sought an interlocutory appeal, and this request was granted by the supreme court.

---

1. This refers to the "effects" test found in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

### III. Scope of Review

■ When reviewing a ruling on a motion to dismiss due to lack of personal jurisdiction, we accept as true the allegations of the petition and the contents of uncontroverted affidavits. *Hodges v. Hodges*, 572 N.W.2d 549, 551 (Iowa 1997). The district court's findings of fact have the effect of a jury verdict and are subject to challenge only if not supported by substantial evidence in the record. *Twaddle v. Twaddle*, 582 N.W.2d 518, 519 (Iowa Ct.App.1998). We are not bound by the court's application of legal principles or its conclusions of law. *Id.*

### IV. Personal Jurisdiction

#### A. Background

■ Under the Due Process Clause of the Fourteenth Amendment, personal jurisdiction over a nonresident defendant only exists when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Hodges*, 572 N.W.2d at 551 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945)). The contacts are sufficient if the defendant "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980). This "fair warning" requirement is satisfied if the defendants have purposely directed their activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). A nonresident defendant should not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 472, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985).

■ Under Iowa Rule of Civil Procedure 1.306, Iowa's jurisdiction reaches to the widest due process parameters of the federal constitution. *Meyers v. Kallestead*, 476 N.W.2d 65, 67 (Iowa 1991). When a defendant raises a challenge on these grounds, the plaintiff has the burden to present a prima facie showing of personal jurisdiction. *State ex rel. Houk v. Grewing*, 586 N.W.2d 224, 226 (Iowa Ct. App.1998). Once the plaintiff establishes a prima facie case, the defendant has the burden of producing evidence to rebut that showing. *Id.*

■ In determining whether a party's contacts with Iowa are sufficient to confer jurisdiction, we consider the following factors:

(1) the quantity of the contacts;

(2) the nature and quality of the contacts;

(3) the source of and connection of the cause of action with those contacts;

(4) the interest of the forum state; and

(5) the convenience of the parties.

*Cascade Lumber Co. v. Edward Rose Bldg. Co.*, 596 N.W.2d 90, 92 (Iowa 1999). The first three factors are the most important. *Id.*

#### B. Direct Contacts

■ It is clear defendants have no direct contacts with Iowa. They have no offices, agents, employees, or property in Iowa, and they neither ship nor receive products from Iowa. While Gerber formerly lived in Iowa, he had been living in France for about one and one-half years at the time the suit was filed. Thus, the first two factors, the quantity and quality of contacts, weigh against the assertion of jurisdiction in Iowa. *See Guinness Import*

*Co. v. Mark VII Distrib., Inc.*, 153 F.3d 607, 614 (8th Cir.1998).

### C. *Calder* "Effects" Test

The third factor distinguishes whether jurisdiction is specific or general. *EFCO Corp. v. Aluma Sys., USA, Inc.*, 983 F.Supp. 816, 820 (S.D.Iowa 1997). The Eighth Circuit has stated:

> Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state, while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.

*Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir.1994); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404, 411–12 (1984).

Plaintiffs claim Iowa has specific jurisdiction over defendants under the "effects" test found in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In *Calder*, the United States Supreme Court determined California had personal jurisdiction over a suit brought in California against Florida defendants who had engaged in an intentional tort (libel) by publishing an article in California, which they knew would have an impact upon the individual plaintiff, who lived and worked in California. *Id.* at 789, 104 S.Ct. at 1487, 79 L.Ed.2d at 812. The court noted the brunt of the harm to plaintiff was suffered in California. *Id.* at 788–89, 104 S.Ct. at 1487, 79 L.Ed.2d at 812. The court concluded that under these circumstances, defendants must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. *Id.* at 790, 104 S.Ct. at 1487, 79 L.Ed.2d at 812 (quoting *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d at 501).

Courts have interpreted the "effects" test as requiring a plaintiff to show: (1) the defendant's acts were intentional; (2) these actions were uniquely or expressly aimed at the forum state; and (3) the brunt of the harm was suffered in the forum state, and the defendant knew the harm was likely to be suffered there. *Estate of Witko v. Hornell Brewing Co.*, 156 F.Supp.2d 1092, 1097–98 (D.S.D.2001); *Zumbro, Inc. v. Calif. Natural Prods.*, 861 F.Supp. 773, 782–83 (D.Minn.1994); *see also IMO Indus., Inc. v. Keikert AG*, 155 F.3d 254, 265–66 (3rd Cir.1998) (second and third elements switched).

The torts alleged in this case may be considered intentional torts. As we noted, for purposes of considering the motion to dismiss, we accept as true the allegations of the petition. *Hodges*, 572 N.W.2d at 551. Thus, the first element of the *Calder* test has been satisfied.[2]

In considering the second element, it is not clear defendants' actions were uniquely or expressly aimed at Iowa. One court has stated the intended forum or focal point regarding one international company's interactions with another international company is often difficult to determine. *EFCO Corp.*, 983 F.Supp. at 821. Under *Calder*, mere foreseeability of injury to a citizen of the forum is not sufficient; but rather, the injury must be caused by activity intentionally directed by defendants at the plaintiff and his or her forum. *CoStar Group, Inc. v. LoopNet, Inc.*, 106

---

2. In reaching this conclusion, however, we make no findings regarding the relative merits of the case for purposes other than considering the motion to dismiss. Both parties expended considerable effort to present the merits of this matter, but these arguments are irrelevant to our consideration of the motion to dismiss.

F.Supp.2d 780, 786 (D.Md.2000). This element relates to the due process requirement that defendants must have acted toward the forum state with sufficient intent to make them "reasonably anticipate being haled into court there." *Noonan v. Winston Co.,* 135 F.3d 85, 90 (1st Cir.1998).

In *EFCO Corp.,* an Iowa corporation and its Canadian subsidiary brought suit against California and Canadian companies, alleging trade secret violations. In determining whether defendants "aimed" their actions at Iowa, the court noted, "EFCO and Aluma are two of three major competitors in the same market. They have been engaged in direct competition for several years." *EFCO Corp.,* 983 F.Supp. at 823. The court concluded, "EFCO's headquarters and principal place of business, and therefore the Iowa forum, was clearly the focal point of the alleged misappropriation." *Id.*

We find *EFCO* distinguishable from the facts in the present case. In *EFCO,* the focus was the primary company in Iowa and not the subsidiary in Canada. Here, Roquette in France is the primary company and RAI is its wholly owned subsidiary. Also, in the past, defendants were direct competitors of Roquette in Europe, not RAI in the United States. Roquette and Amylum Group are two major competitors in the same market, and have been engaged in direct competition for several years. Amylum Group and RAI are not direct competitors. The evidence showed Amylum Group had made only nominal shipments of any substances related to sorbitol to the United States in the past,[3] and none specifically to Iowa. Therefore, it

seems more likely the focal point of defendants' actions was Europe.

█ Plaintiffs attempt to raise the specter that Amylum Group *might* ship products to the United States in the future. The district court concluded Amylum Group was attempting to sell its products in the United States. The district court's conclusion, however, was based in part on facts that occurred after the petition was filed on March 23, 1999. The court considered an Amylum Group strategic review that occurred in April or May 1999, and negotiations for an attempted sale of sorbitol in the United States beginning in June 1999.[4] We determine only contacts established before the petition was filed should be considered. *See United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 619 n. 4 (1st Cir.2001); *Noonan,* 135 F.3d at 93 n. 8. Jurisdiction should be based on defendants' actions as of the time the petition was filed, not later contacts with a forum. *Swiss Am. Bank,* 274 F.3d at 619 n. 4. Based on defendants' actions before the petition was filed in this case, we find there is not substantial evidence to support the district court's conclusion Amylum Group was engaged in direct competition with RAI.

In addition, Amylum Group did not reach into Iowa to hire Gerber; he was living in France at the time, which undercuts the assertion that Amylum Group expressly aimed its actions at Iowa. *See Drayton Enter., L.L.C. v. Dunker,* 142 F.Supp.2d 1177, 1184 (D.N.D.2001).

**3.** Evidence was presented of Amylum Group's exports to the United States from January 1998 to November 1999. Between August 1998 and December 1998, Amylum Group had eight shipments, in small amounts, of a substance called sorbogem, which we will assume is related to sorbitol. Six of the shipments were made to Amylum Group's joint venture partner, SPI Polyols, Inc., in what it described as a buy-back agreement.

**4.** Although not relevant to our review, we note the negotiations fell through and no sorbital was shipped to the United States.

Based on all of these factors, we conclude there is not sufficient evidence to show defendants' actions were uniquely or expressly aimed at Iowa, or that defendants could reasonably anticipate being haled into court here. We conclude plaintiffs have not established the second element of the *Calder* test.

On the third element, we find there is not substantial evidence to show the brunt of the harm incurred by defendants' actions was suffered in Iowa. Obviously, some harm, the "effects" of the alleged torts, was suffered by RAI in Iowa. In regard to this third element, however, in the Eighth Circuit it is not sufficient if the sole connection between the defendants and the forum is the effects of an intentional tort. *Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir.1992); *Estate of Witko*, 156 F.Supp.2d at 1099; *Drayton Enter.*, 142 F.Supp.2d at 1185. There must be some connection independent of the effects of the tort to justify jurisdiction. *Drayton Enter.*, 142 F.Supp.2d at 1185; *see Oriental Trading Co. v. Firetti*, 236 F.3d 938, 943 (8th Cir. 2001) (emphasizing numerous telephone calls, faxes, and invoices sent to forum state); *Finley v. River North Records, Inc.*, 148 F.3d 913, 915 (8th Cir.1998) (telephone and mail contact with plaintiff in forum state); *Dakota Indus. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir.1991) (defendant shipped products infringing plaintiff's trademark into the forum state); *Estate of Witko*, 156 F.Supp.2d at 1099 (defendant sold an alcoholic beverage knowing the name was associated with the forum state and that use of the name on an alcoholic beverage was offensive to plaintiffs); *see also Swiss Am. Bank*, 274 F.3d at 624 (noting that in *Calder* the actual tort or injury, not just its consequences or "effects" occurred within the forum).

In Iowa also, more than the effects of a tort is necessary to invoke the jurisdiction of our courts. After citing *Calder*, the Iowa Supreme Court stated, "The minimum contacts requirements demand contact having to do with the state itself; they are not satisfied from a mere 'effect' felt by a plaintiff within his or her state of residence." *Percival v. Bankers Trust Co.*, 494 N.W.2d 658, 659–60 (Iowa 1993); *see also Taylor v. Trans–Action Assocs., Inc.*, 509 N.W.2d 501, 505 (Iowa Ct.App.1993). In *Percival*, the plaintiffs claimed the California defendant had tortiously interfered with a California trust. The supreme court noted that the defendant had no connection with Iowa, other than the fact that two of the five plaintiffs lived here and were presumably affected by the defendant's conduct. *Percival*, 494 N.W.2d at 660. The court concluded Iowa did not have jurisdiction over the defendant. *Id.*

The case closest on point to the present case is *Drayton Enterprises*, where the court summarized the facts as follows:

> [Defendant] Dunker worked for Drayton [Enterprises] in North Dakota from August 1996 until August 1997. In that role he was entrusted with trade secrets and other proprietary information, which he had contracted to keep secret. He voluntarily left Drayton in 1997, at which point he signed another contract in North Dakota protecting those trade secrets. He then moved to Minnesota, where he resided for two years. In 1999, Dunker was hired by VAP [Value–Added Products]; he moved to Oklahoma and now performs work similar to what he did for Drayton. Drayton alleged that Dunker has revealed its trade secrets to VAP, and that VAP hired him with the secrets in mind. While Dunker and VAP deny this, there seems to be no argument that if Dunker did reveal any

trade secrets to VAP, he did so in Oklahoma after he was hired in 1999.

*Drayton Enter.,* 142 F.Supp.2d at 1183–84.

Drayton Enterprises filed suit against Dunker and VAP, alleging Dunker disclosed trade secrets and violated a confidentiality agreement, and that VAP interfered with this contract and wrongfully obtained trade secrets. The federal court concluded the only direct connection between the litigation filed in North Dakota and the defendants' actions was that the injury caused by the alleged tort would be felt in North Dakota. *Id.* at 1184. The court noted Dunker legitimately obtained the information in North Dakota, before VAP was ever involved, making VAP's contact with North Dakota fortuitous and attenuated. *Id.* The court also noted that the tort was allegedly committed in Oklahoma, because no tort was committed until Dunker revealed the information in Oklahoma. *Id.* The court concluded there was no connection between defendants and North Dakota beyond the alleged tort, and this was insufficient because an independent connection in addition to the effects of the tort was necessary to justify jurisdiction. *Id.* at 1185.

The facts in this case are very similar to those presented in *Drayton Enterprises,* and the claims raised, breach of a confidentiality agreement, interference with a contract, and trade secret violations, are also very similar. Gerber obtained information during his employment with RAI in Iowa, long before he had any contact with the Amylum Group. Thus, the Amylum Group did not purposely target Iowa, but it was fortuitous that Gerber's information was acquired there. Also, if the alleged torts were committed, they were committed in France or Belgium, during Gerber's employment with the Amylum Group. As noted above, the Amylum Group has no corporate presence in Iowa, and had no business with any entity in Iowa. There was no evidence of telephone, mail, or fax contact by any of the defendants to anyone in Iowa. Defendants did not ship any products into Iowa. Furthermore, there are no allegations defendants engaged in conduct uniquely offensive to Iowans. Thus, we conclude there is no connection between defendants and Iowa, other than the "effects" of the alleged torts. Under the interpretation of *Calder* found in the Eighth Circuit and Iowa, this is insufficient to justify jurisdiction in Iowa.

### D. Interest and Convenience

We turn then to a consideration of Iowa's interest in the case, the fourth factor in the five-factor test we use to determine personal jurisdiction. *See Cascade Lumber,* 596 N.W.2d at 92. The fourth and fifth factors do not have as much weight as the first three factors. *Id.* The fourth factor weighs in favor of plaintiffs because Iowa has an interest in resolving the disputes of its corporate citizens. However, Iowa's interest in protecting its citizens regarding business matters is not as strong as the State's interest in other matters. *OmniLingua, Inc. v. Great Golf Resorts,* 500 N.W.2d 721, 725 (Iowa Ct. App.1993) (comparing the State's interest in a contractual agreement with its interest in the paternity of a child or insurance policyholders); *see also State ex rel. Houk,* 586 N.W.2d at 227 (finding Iowa has a substantial interest in recovering child support for child born in Iowa).

We next consider the convenience of the parties, the last factor in the five-factor test. RAI is located in Iowa, but all the other parties are located in France or Belgium. Most of the witnesses are located in Europe, and several speak only French. While RAI could be disadvantaged if this case were held in Europe, Roquette would not be. Additionally, there is a question

concerning whether Iowa could compel the attendance of unwilling witnesses and whether a judgment could be enforced, if one is obtained. *See In re Marriage of Kimura,* 471 N.W.2d 869, 878 (Iowa 1991). Furthermore, we note that courts must exercise great care before exercising personal jurisdiction over foreign nationals. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 115, 107 S.Ct. 1026, 1033–34, 94 L.Ed.2d 92, 106 (1987); *Neal v. Janssen,* 270 F.3d 328, 333 (6th Cir.2001); *Noonan,* 135 F.3d at 93. Based on all of these considerations, we determine Iowa is not the most convenient forum for this case.

## V. Summary

After carefully considering each of the five factors we deem sufficient to confer jurisdiction in Iowa, we conclude the factors do not weigh in favor of jurisdiction here. We determine the district court erred in its application of the *Calder* "effects" test. We reverse the decision of the district court, on the ground that Iowa does not have personal jurisdiction over defendants. Based on our conclusions, we do not separately discuss the issue of forum non conveniens.

**REVERSED.**