Mylan Technologies, Inc. v. Zydus Noveltech, Inc., No. S0041-09 CnC (Crawford, J., Jan. 24, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                                          CIVIL DIVISION
Chittenden Unit                                                   Docket No. S0041-09 CnC


MYLAN TECHNOLOGIES, INC. and
MYLAN INC.
      Plaintiffs


      v.


ZYDUS NOVELTECH, INC., SHARAD K. GOVIL,
CADILA HEALTHCARE, LTD., PANKAJ PATEL
and SUNIL ROY
      Defendants


### DECISION ON MOTIONS TO DISMISS (PERSONAL JURISDICTION)

This case involves a dispute between two companies that develop or manufacture transdermal patches (devices for the delivery of medication through the skin). Plaintiffs Mylan Technologies, Inc. and its parent company Mylan, Inc. (collectively, "Mylan") allege that defendant Dr. Sharad Govil took important trade secrets when he left his position as a senior Mylan executive and scientist and joined defendant Zydus Noveltech, Inc. (Zydus). Mylan asserts that Dr. Govil's actions constitute breach of a trade secrets contract (Count I), breach of the covenant of good faith and fair dealing (Count II), misappropriation of trade secrets (Count IV), breach of fiduciary duty (Count V), and unfair competition (Count VI). Mylan also alleges that Zydus's parent company Cadila Healthcare, Ltd. (Cadila),[1] Cadila's Chairman Pankaj Patel, and Cadila's head of research and development Sunil Roy (collectively, the "Indian defendants") and Zydus tortiously interfered with the trade secrets contract between Dr. Govil and Mylan (Count III), misappropriated trade secrets (Count IV), and engaged in unfair competition (Count VI).

On May 25, 2011, Cadila filed a motion to dismiss, arguing, among other things, that it is not subject to personal jurisdiction in Vermont. Also on that date, the individual defendants filed a similar motion to dismiss, arguing that the court lacks personal jurisdiction over them.[2] Mylan filed separate oppositions (one opposing Cadila's motion and one opposing Patel and Roy's motion) on July 11, 2011. Cadila, Patel and Roy filed separate replies on August 22, 2011. Mylan filed a single surreply on September 7, 2011. The Indian defendants together filed their own surreply on September 22, 2011. The

---

[1] To be precise, it appears that Cadila is in fact Zydus's *grand*parent, since it seems undisputed that the Irish company ZIPL is the majority owner of Zydus, and ZIPL is in turn a wholly-owned subsidiary of the Indian company Cadila.

[2] The corporate and individual Indian defendants also moved to dismiss for insufficient or untimely service of process. The court understands that service of process upon the Indian defendants under the Hague Convention is now complete. The court therefore addresses here only the issues of personal jurisdiction.

court has considered the parties' filings as well as their arguments at a hearing held on January 17, 2012.

APPLICABLE STANDARD

"A court has discretion to decide a pretrial motion to dismiss for lack of personal jurisdiction on the basis of affidavits alone, to permit discovery, and to conduct an evidentiary hearing." *Godino v. Cleanthes*, 163 Vt. 237, 239 (1995) (citing *Roman Catholic Diocese of Burlington, Inc. v. Paton Insulators, Inc.*, 146 Vt. 294, 296 (1985)). "It is preferable to conduct an evidentiary hearing on the merits of the motion where there are questions of credibility or disputed issues of fact." *Id*. When a 12(b)(2) motion is decided without such a hearing, then the court "must consider the pleadings and affidavits in a light most favorable to the plaintiff." *N. Sec. Ins. Co. v. Mitec Elecs., Ltd.*, 2008 VT 96, ¶ 15, 184 Vt. 303. However, the plaintiff bears the burden of showing that the court has personal jurisdiction over the defendant. See *N. Aircraft, Inc. v. Reed*, 154 Vt. 36, 40 (1990); 5B Wright, Miller & Kane, *supra*, § 1351 ("[T]he plaintiff bears the burden to establish the court's jurisdiction . . . ."). To meet its burden, the plaintiff need only make "a prima facie showing of jurisdiction, or, in other words, demonstrate facts which would support a finding of jurisdiction." *Mitec*, 2008 VT 96, ¶ 15 (quoting *Godino*, 163 Vt. at 239). "Personal jurisdiction must be proved independently as to each defendant." *Id*. (citing *Schwartz v. Frankenhoff*, 169 Vt. 287, 294 (1999)).

BACKGROUND

For present purposes, there does not appear to be any dispute with respect to the facts bearing on the jurisdictional questions.[3] The following background is based on the allegations in the First Amended Complaint and the factual assertions in the parties' filings.

Mylan, Inc. is a Pennsylvania corporation and is in the pharmaceutical business. First Am. Compl. ¶ 1 (filed Nov. 30, 2009). Mylan, Inc.'s wholly-owned subsidiary, Mylan Technologies, Inc., is located in St. Albans, Vermont and is involved in the design, development, and manufacture of transdermal drug delivery systems. *Id*. ¶ 2. Dr. Sharad Govil is a Vermont resident and was a senior executive and senior scientist at Mylan for approximately thirteen years prior to his resignation in September 2006. *Id*. ¶¶ 4, 26. He had in-depth knowledge of Mylan's trade secret and confidential information. *Id*. At the commencement of his employment, Dr. Govil signed a Trade Secrets and Invention Agreement, under which he agreed not to disclose Mylan's

---

[3] Cadila argued in its motion to dismiss that some of Mylan's jurisdictional allegations are "demonstrably false." Cadila's Mot. to Dismiss at 21 (filed May 25, 2011). Specifically, Cadila attacked the allegations in paragraph 11 of Mylan's complaint that Cadila is a "majority owner of Zydus" and that "high-level representatives of Cadila traveled to Vermont in connection with their efforts to recruit Govil." In their motion, defendants Patel and Roy also denied that they ever physically came to Vermont to recruit Dr. Govil. Patel and Roy's Mot. to Dismiss at 6 (filed May 25, 2011). The parties do not now dispute the ownership relationship between Cadila and Zydus or the facts that Mr. Patel has never physically traveled to Vermont and Mr. Roy has only traveled to Vermont once.

2

confidential information and trade secrets, and also agreed to a restriction on his business activities for five years after the termination of his employment. *Id*. ¶¶ 20–24.

Cadila is an Indian pharmaceutical company and a significant manufacturer of generic drugs. *Id*. ¶ 6. In December 2005 or January 2006, Cadila's head of Research and Development, Mr. Roy—a citizen and resident of India—placed a telephone call from India to Dr. Govil at Govil's home in Vermont. See *id*. ¶¶ 8, 31; see also Mylan's Opp'n to Cadila's Mot. to Dismiss at 20 (filed July 11, 2011). In that call, Mr. Roy sought to "initiate discussion regarding a collaboration" between Mylan and Cadila to develop and manufacture transdermal delivery products. First Am. Compl. ¶ 31. Subsequently, Dr. Govil led an internal team at Mylan to assess the opportunity presented and to recommend whether a relationship with Cadila would be advantageous for Mylan. *Id*. ¶ 32. Mylan's discussions with Cadila about a potential collaboration were active and ongoing during the first quarter of 2006, with Dr. Govil representing Mylan's interests. *Id*. ¶¶ 33, 34.

In April 2006, prior to the conclusion of Mylan and Cadila's discussions, Mr. Roy called Dr. Govil again to coordinate a discussion between Dr. Govil and Cadila's Chairman, Mr. Patel. See *id*. ¶ 33; Mylan's Opp'n to Patel and Roy's Mot. to Dismiss at 6 (citing Govil Tr. 81:1–82:11, Oct. 26, 2009); Mylan's Opp'n to Cadila's Mot. to Dismiss at 20 (citing Govil Tr. 77:6–78:20; 80:21–81:14). Like Mr. Roy, Mr. Patel is a resident and citizen of India. First Am. Compl. ¶ 7. Mr. Roy sought to gauge Dr. Govil's interest in a "personal opportunity" with Cadila to develop transdermal drug products that would compete with Mylan's products. See *id*. ¶ 33; Mylan's Opp'n to Patel and Roy's Mot. to Dismiss at 6 (citing Govil Tr. 81:1–82:11, Oct. 26, 2009); Mylan's Opp'n to Cadila's Mot. to Dismiss at 20 (citing Govil Tr. 77:6–78:20; 80:21–81:14). Dr. Govil indicated that he was interested in exploring the opportunity. Govil Tr. 81:19–20.

Within about a month, Dr. Govil spoke with senior Cadila executives, including defendants Patel and Roy. First Am. Compl. ¶ 34. The focus of his discussions, however, was no longer aimed at a collaboration between Mylan and Cadila, but had instead shifted to a "joint venture" between Dr. Govil himself and Cadila that would *compete* with Mylan. *Id*. ¶ 33. Over a period of several months, while still employed at Mylan, Dr. Govil held additional meetings with senior Cadila management, traveled to India to tour Cadila's manufacturing facilities, and negotiated with Cadila over the terms of a Joint Venture Agreement that would create Zydus Noveltech, Inc. *Id*. ¶¶ 35, 41. During this time, defendants Patel and Roy actively solicited, recruited, and engaged with Dr. Govil in an effort to gain access to Mylan's trade secrets and confidential information. *Id*. ¶ 35. In an effort to demonstrate the value he could bring to Cadila, Dr. Govil divulged or promised to divulge those secrets and information. *Id*. ¶ 37.

Dr. Govil reported to Mylan that the discussions with Cadila had concluded because Cadila lacked interest in a transdermal collaboration and failed to respond to Mylan's requests for information. *Id*. ¶ 36. Mylan alleges that the real reason Cadila abandoned discussions with Mylan was because it recognized that it could obtain access

to Mylan's technology and products through Dr. Govil without the need for collaboration with Mylan. *Id*.

On September 21, 2006, Dr. Govil and Cadila—through its wholly-owned Irish subsidiary ZIPL—entered into a Joint Venture Agreement. See *id*. ¶¶ 40, 45. The Joint Venture Agreement created Zydus Noveltech, Inc. *Id*. ¶ 41. Dr. Govil was appointed Zydus's Chief Executive Officer and was one of three members of Zydus's Board of Directors. *Id*. On September 25, 2006, Dr. Govil submitted his resignation to Mylan. *Id*. ¶¶ 38, 40.

Zydus is registered and authorized to do business in Vermont, and in fact has an office in South Burlington, Vermont. *Id*. ¶¶ 3, 11. Through its wholly-owned Irish subsidiary ZIPL, Cadila has a majority ownership stake in Zydus. *Id*. ¶ 45. Mylan asserts that Mr. Roy is closely involved in the product development efforts performed jointly by Cadila and Zydus, citing Roy's service on a Joint Steering Committee comprised of representatives of both companies, and emails from Roy to Govil in 2009. See *id*. ¶ 13; Mylan's Opp'n to Patel and Roy's Mot. to Dismiss at 7; Mylan's Opp'n to Cadila's Mot. to Dismiss at 23–24. There appears to be no dispute that Cadila has entered into a Manufacturing and Supply Agreement with Zydus whereby the transdermal products developed by Zydus will be manufactured at Cadila's facilities in India. Mylan's Opp'n to Cadila's Mot. to Dismiss at 24. Mr. Roy has traveled to Vermont once in his life—in May of 2008.

Mr. Patel serves as Chairman of Zydus's Board. First Am. Compl. ¶¶ 7, 41. Mr. Patel has never been to Vermont, although he has attended Zydus board meetings by telephone. See Mylan's Opp'n to Patel and Roy's Mot. to Dismiss at 8. Mr. Patel also had a role in negotiating Dr. Govil's Employment Agreement, and his signature appears on the Employment Agreement. See *id*. (citing Bulut Aff. Ex. O). Dr. Govil's Employment Agreement with Zydus generally indemnifies Dr. Govil for suits or proceedings connected with the violation or breach of any covenants not to complete he entered into with his former employers. See *id*.; First Am. Compl. ¶ 42. According to Mylan, this demonstrates that, at they time they solicited and recruited Dr. Govil, Cadila and defendants Patel and Roy knew of Dr. Govil's contractual non-compete obligations to Mylan. *Id*. Indeed, Mylan asserts that defendants Patel and Roy did actually know about Dr. Govil's contractual obligations at the time that Dr. Govil's employment contract with Zydus was being negotiated. See *id*. ¶ 34; Mylan's Opp'n to Cadila's Mot. to Dismiss at 20.

In August 2008, Mylan learned that Dr. Govil had become Zydus's Chief Executive Officer. First Am. Compl. ¶ 5. Later, Mylan discovered that Zydus was developing products that are the same as or similar to Mylan's products. *Id*. On or about September 8, 2008, Mylan sent letters to Zydus, Dr. Govil, and Cadila, expressing concerns about preservation of Mylan's trade secrets and confidential information and about Dr. Govil breaching his Trade Secrets Agreement. *Id*. ¶ 46. This litigation followed.

4

ANALYSIS

Although the parties have discussed general jurisdiction, the court does not need to address that issue if it can assert specific jurisdiction. *Brown v. Cal Dykstra Equip. Co.*, 169 Vt. 636, 637 (1999) (mem.). The court therefore begins with the requirements for specific personal jurisdiction. The terms of Vermont's long arm statute, 12 V.S.A. § 913(b), are "broad enough to permit a court to exercise jurisdiction over an absent defendant 'to the full extent permitted by the Due Process Clause.'" *In re R.W.*, 2011 VT 124, ¶ 23, available at http://info.libraries.vermont.gov/supct/current/op2011-006.html (quoting *N. Aircraft, Inc. v. Reed*, 154 Vt. 36, 40 (1990)). "Due process allows a forum to assert jurisdiction over a nonresident defendant who has 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id*. The court applies the minimum contacts test to the corporate and individual Indian defendants in turn, and then addresses the reasonableness inquiry for all of the Indian defendants together.

I. Minimum Contacts

A. Cadila

Cadila argues that it has no contacts with Vermont related to Mylan's action that permit the exercise of specific jurisdiction over Cadila. Cadila says that its indirect ownership (through ZIPL) of Zydus is not related to Zydus's allegedly tortious conduct. Cadila also asserts that it has not purposefully reached into Vermont in connection with the subject matter of this action. In opposition, Mylan asserts that Cadila deliberately reached into Vermont to solicit Dr. Govil to breach his contractual obligations to Zydus, conspired with Dr. Govil to misappropriate Zydus's trade secrets, and entered into an agreement relating to the division of labor as between Cadila and Zydus. Mylan asserts that its claims against Cadila arise from or relate to those actions. In reply, Cadila maintains that Mylan has failed to identify a nexus between Cadila's alleged contacts with Vermont and any of Mylan's claims.

"Specific jurisdiction exists when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 626 (2001) (mem.) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996)). The court rejects Cadila's contention that Mylan's jurisdictional allegations are unrelated to Mylan's claims. The allegations in Mylan's complaint assert that Cadila has a significant contact with Vermont in the sense that Cadila allegedly solicited Mylan's Vermont-based employee to join Cadila's Vermont subsidiary, and successfully encouraged that employee to disclose Mylan's confidential information. That is precisely the contact out of which Counts III, IV, and VI arise. This was not a random, fortuitous, or attenuated contact with Vermont. Assuming the truth of the allegations in the complaint, Cadila intended to benefit from Dr. Govil's defection and knowledge.

5

Other courts have reached the same conclusions in similar factual circumstances. See *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 722–23 (D.S.C. 2007) (Mississippi corporation was subject to specific jurisdiction in South Carolina in an action for misappropriation of trade secrets, tortious interference with relations, and unfair trade practices because it intentionally and specifically directed communications into South Carolina for the purpose of enticing employees of a South Carolina company to misappropriate trade secrets); *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 328 S.W.3d 545, 554 (Tex. App. 2010) (Maryland corporation was subject to specific jurisdiction in Texas in action for misappropriation and theft of trade secrets and tortious interference with contracts for its role in contacting, recruiting, and compensating a Texas engineer at a competing Texas corporation for his skill and knowledge to improve the Maryland corporation's prototype medical device).

Cadila's attempt to show that there is no "nexus" between its contacts with Vermont and Mylan's three claims against Cadila is unavailing. Cadila asserts, for example, that the two telephone calls to Dr. Govil in late 2005 or early 2006 do not relate to the alleged manufacture of competing products or any harm to Mylan (Counts IV and VI). Similarly, Cadila argues that the phone calls—since they were just talk, after all—did not interfere with any contract (Count III). But the test is not whether the contacts with the forum were, by themselves, a completed tort. If that were the case, then any tort that could not be completed instantaneously, if committed by a foreign defendant, would not be actionable because the defendant could simply dis-aggregate the components of the tort and assert that for at least one of those elements, the defendant was not contacting the forum. The test is whether the suit *arises out of* or *relates to* the defendant's contacts. For alleged intentional torts such as these, it is appropriate to examine the harmful effects of the conduct in Vermont. The court therefore turns to that topic.

The court rejects Cadila's related contentions that the alleged conduct by Cadila giving rise to the claims took place in India rather than Vermont and that the alleged effects of the tort in Vermont cannot alone support jurisdiction. It is not necessary for the tortious conduct to have actually occurred in Vermont. See *Audsley v. RBS Citizens, N.A.*, No. 5:10-cv-208, 2011 WL 1397312, at *4 (D. Vt. Apr. 11, 2011) (alleged intentional tortfeasor's conduct in New Hampshire was purposely directed toward a Vermont individual and her Vermont activities, and thus could reasonably anticipate being haled into a Vermont court). Even assuming that Cadila's allegedly tortious actions did take place in India, "due process permits the exercise of personal jurisdiction over a party who intentionally acts outside the forum state to cause tortious harm within the forum state." *Schwartz v. Frankenhoff*, 169 Vt. 287, 293 (1999) (citing *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)).

Cadila maintains that the alleged effects of the tort in Vermont are insufficient to support jurisdiction. It asserts that, in trade secret misappropriation cases, the existence of effects of the tort in the forum state is insufficient to establish personal jurisdiction. Cadila does not explain what policy reason might support such a distinction, the cases it cites do not make a statement that broad. Indeed, there is authority to the contrary. See

*TEKSystems, Inc. v. Modis, Inc.*, No. 08 C 5476, 2008 WL 5155667, at *3 (N.D. Ill. Dec. 5, 2008) (finding personal jurisdiction on secret misappropriation and tortious-interference claims based on effects doctrine (citing *Calder*)); *Pavlovich v. Superior Court*, 58 P.3d 2, 7 (Cal. 2002) ("Although *Calder* involved a libel claim, courts have applied the effects test to other intentional torts, including business torts.").

To the extent Cadila's position is that effects in the forum are insufficient *by themselves*, that appears to be correct. E.g., *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 280 (4th Cir. 2009) (noting that *Calder*'s "effects test does not supplant the minimum contacts analysis, but rather informs it"); *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998) ("[W]e . . . agree with the conclusion reached by the First, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that jurisdiction under *Calder* requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum."); *Drayton Enterprises, L.L.C. v. Dunker*, 142 F. Supp. 2d 1177, 1185 (D.N.D. 2001) ("[S]omething more than 'mere effects' is required"). If a defendant with no contacts in Vermont commits a tort that *fortuitously* harmed a plaintiff in Vermont, then there would probably be no basis for a Vermont court to assert jurisdiction. But, as the *Schwartz* Court explicitly stated, if the defendant's actions outside of Vermont are *intentionally* directed into Vermont, then there would be a basis for the Vermont courts to assert jurisdiction. Accord *Bancroft & Masters, Inc. v. August Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("We now conclude that 'something more' is what the Supreme Court described as 'express aiming' at the forum state."). The allegations of the complaint are sufficient—at least at this stage—to come within that latter category.

The other cases Cadila cites are distinguishable. In *Roquette America, Inc. v. Gerber*, a Belgian company contacted a French citizen in France who worked for a French company but who used to work in Iowa for the French company's Delaware subsidiary. 651 N.W.2d 896, 897–98 (Iowa Ct. App. 2002). The Delaware subsidiary sued the worker and the Belgian company in Iowa after the worker left to work for the Belgian company. The *Roquette* court concluded that the likely "focal point" of the defendants' actions was Europe, not Iowa. *Id.* at 900–01. The court also noted that the Belgian company did not reach into Iowa to hire the worker, who was living in France at the time. *Id.* at 901. The court concluded that there was insufficient evidence to show that defendants' actions were uniquely or expressly aimed at Iowa. *Id.* at 902. In contrast, the facts alleged in this case are quite different, and support the conclusion that the "focal point" of Cadila's actions was Vermont.

*Gognat v. Ellsworth* is distinguishable because in that case the plaintiff failed to demonstrate that he suffered an injury in the forum sufficient to invoke the long-arm statute. 224 P.3d 1039, 1053 (Colo. App. 2009). The court reasoned that, at most, the plaintiff had alleged that he was injured in Colorado because he was a Colorado resident and any damages would be payable to him in Colorado. *Id.* The court concluded that that was insufficient. This is not a case where the defendant's only connection to the forum is the fact that the plaintiff might lose profits in the forum. *Pavlovich* is similarly

7

distinguishable—there was no evidence in that case that the out-of-state actor expressly aimed his conduct towards the forum. 58 P.3d at 11.

Finally, Cadila argues that even if the effects in Vermont could be enough, no products have yet been sent to the United States or to Vermont, and thus Mylan can point to no actual effects in Vermont of the alleged misappropriation. It is true that one of the requirements of the "effects" test is that the defendant causes harm that the defendant knows is likely to be suffered in the forum state. *Liberty Synergistics, Inc. v. MicroFlo Ltd.*, No. CV 11-0523(SJF)(ETB), 2011 WL 4974832, at *5 (E.D.N.Y. Oct. 19, 2011) (citing *Yahoo! Inc. v. La Lique Contre le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc)). The parties have not cited cases analyzing this particular issue, but the court concludes that—although the bulk of the harm would come if Cadila puts products on the market—Mylan has already suffered harm by allegedly having its secrets compromised. Indeed, the complaint alleges that Zydus is now developing products that are similar to or the same as Mylan's products. The point of the prospective injunctive relief that Mylan seeks in its complaint is to prevent Zydus from marketing those products. In sum, the court concludes that Mylan has made a prima facie showing of personal jurisdiction over Cadila.

### B. Defendants Patel and Roy

#### 1. Fiduciary Shield Doctrine

Defendants Patel and Roy assert that the court does not need to undertake the "minimum contacts" analysis as to them because the fiduciary shield doctrine precludes the court from exercising jurisdiction over them. Mylan asserts that the fiduciary shield doctrine has been rejected in New York, and that it is inapplicable in Vermont because Vermont's long-arm statute reaches the limits of federal Due Process. In reply, defendants Patel and Roy argue that New York's rejection of the fiduciary shield doctrine does not make its viability questionable in Vermont. They also argue that none of the cases Mylan cites support the proposition that the fiduciary shield doctrine is inapplicable whenever a state's long-arm statute extends to the limits of Due Process.

This area of law is best described as unsettled. See generally Annotation, *Validity, Construction, and Application of "Fiduciary Shield" Doctrine—Modern Cases*, 79 A.L.R. 5th 587 § 2[a] (2000) ("[M]any jurisdictions still observe the fiduciary shield under certain circumstances as a valid doctrine precluding the assertion of the court's personal jurisdiction over nonresident defendant corporate officers who have engaged in corporate activities in the jurisdiction. Other courts, however, refuse to recognize the doctrine, citing such concerns as fairness to the plaintiff and sufficiency of due process principles and long-arm statutes to guard against an unfair assertion of personal jurisdiction over a corporate employee or agent.").

Thirty years ago, in *Marine Midland Bank, N.A. v. Miller*, the Second Circuit recognized the fiduciary shield doctrine:

8

It is undisputed that an individual who commits a tort while acting in his capacity as a corporate officer or employee may be held personally liable. . . . At issue in this case is not whether such a person may be liable, but rather whether and when a person acting in New York in his capacity as a corporate employee may be subject to jurisdiction as an individual under the relevant provisions of the New York long-arm statute.

The teaching of the courts of this Circuit and of New York is that there is a dichotomy between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing the amenability of such agents to personal jurisdiction solely on the basis of those acts. . . . These cases have recognized that if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct. Thus, his conduct, although it may subject him to personal liability, may not form the predicate for the exercise of jurisdiction over him as an individual. The underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer. . . .

As an equitable principle, the fiduciary shield doctrine is not applied mechanically; the determination of the appropriateness of its application requires an analysis of the particular facts of the case. In each instance, fairness is the ultimate test. Its applicability depends generally on the employee's faithful pursuit of the corporation's interests rather than his own interests. Thus, when a corporate employee acts in his own personal interest rather than in the best interest of his corporation, he is not protected by the fiduciary shield since it is equitable that his self-interested actions be considered his own and be treated as a predicate for the exercise of jurisdiction over him personally.

664 F.2d 899, 902–03 (2d Cir. 1981) (citations and footnote omitted). The *Marine Midland* court noted that "[t]he fiduciary shield doctrine is not a constitutional principle, but is rather a doctrine based on judicial inference as to the intended scope of the long arm statute." *Id.* at 902 n.3 (citing *United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir. 1966)).

The rationale of the *Marine Midland* decision came under attack almost immediately. In *Columbia Briargate Co. v. First National Bank in Dallas*, the Fourth Circuit reasoned that (1) if the doctrine is one of statutory construction, then it would not apply in jurisdictions whose long-arm statutes extended to the outer limits of due process, since the issue would be a question only of federal law, and (2) even if the fiduciary shield doctrine were a constitutional doctrine, it is internally inconsistent because it

9

recognizes corporate officers to be substantively liable but simultaneously defeats the purpose of the law creating substantive liability by shielding them from jurisdiction. 713 F.2d 1052, 1057, 1059 (4th Cir. 1983). Several years later, New York's Court of Appeals expressly disavowed the fiduciary shield doctrine. See *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 46 (N.Y. 1988) ("[I]t is neither necessary nor desirable to adopt the fiduciary shield doctrine in New York. Nothing in the [long-arm] statute's language or the legislative history relating to it suggests that the Legislature intended to accord any special treatment to fiduciaries acting on behalf of a corporation or to insulate them from long-arm jurisdiction for acts performed in a corporate capacity.").

Federal and state courts have since split on whether to recognize the fiduciary shield doctrine. See Annotation, *Validity, Construction, and Application of "Fiduciary Shield" Doctrine—Modern Cases*, 79 A.L.R. 5th 587 §§ 3, 4 (2000) (collecting cases holding that the doctrine is valid and cases holding that it is invalid). Vermont has not considered any of these issues. The parties have not cited any Vermont case applying the fiduciary shield doctrine or discussing it in any detail. Defendants Patel and Roy do cite *USAA Insurance Co. v. Edmonds*, No. 34-1-05 Wncv (Vt. Super. Ct. Feb. 2, 2006) (Toor, J.), available at http://www.vermontjudiciary.org/20062010%20TCdecisioncvl/2006-2-3-1.pdf. In that case, the Washington Superior Court mentioned the doctrine (citing out-of-state cases), but did not apply it or discuss its operation. *Edmonds* is therefore not really useful on this issue. The court has not found any other Vermont cases that go so far as to mention the doctrine.

Although there is certainly ample room for disagreement, the Vermont Supreme Court has repeatedly reaffirmed that the test for jurisdiction under Vermont's long arm statute is coextensive with the minimum contacts test. In the absence of any suggestion that that our Supreme Court would limit the scope of its personal jurisdiction analysis on anything but federal constitutional grounds, it seems that Vermont would not adopt the fiduciary shield doctrine. Accord *RF Tech. Corp. v. Applied Microwave Tech., Inc.*, 369 F. Supp. 2d 24, 32 (D. Me. 2005) ("[W]hatever equitable attractions the fiduciary shield doctrine may have, since it is not constitutionally required I cannot apply it to limit the scope of Maine personal jurisdiction." (quoting *Me. Rubber Int'l v. Envtl. Mgmt. Grp.*, 298 F. Supp. 2d 133, 136 (D. Me. 2004)).

Even if Vermont did recognize the fiduciary shield doctrine, it seems likely that an exception would apply in this case. The parties have spent a good deal of time arguing over whether the doctrine is valid in Vermont, but do not really address how—if it did apply—it might apply to the facts in this case. One potential exception appears in *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683 (6th Cir. 2000). In that case, the court reasoned that "where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on . . . whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment." *Id.* at 698. Here, it appears that the allegations of the complaint are that defendants Patel and Roy were in fact actively and personally involved in recruiting Dr. Govil away from Mylan and over to Zydus.

Another potential exception appears in *Marine Midland* itself: "[W]hen a corporate employee acts in his own personal interest rather than in the best interest of his corporation, he is not protected by the fiduciary shield since it is equitable that his self-interested actions be considered his own and be treated as a predicate for the exercise of jurisdiction over him personally." 664 F.2d at 903. The *Kreutter* court noted that this exception is very broad "because rarely, if ever, does a corporate agent not derive some benefit from acting on behalf of his principal." 522 N.E.2d at 57. This exception for personal interest would seem especially strong in cases where, as here, the defendants are high-ranking corporate officers. See *C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837, 848–49 (N.D. Ill. 2009) (quoting *Margulis v. Med. Parts Int'l, Inc.*, 1999 WL 183648 (N.D. Ill Mar. 25, 1999) for the proposition that "the fiduciary shield defense is unavailable to high-ranking company officers and shareholders [because they] have a direct financial stake in the company's health").

## 2. Specific Jurisdiction

Mylan asserts in its complaint that the court has jurisdiction over defendants Patel and Roy because (1) Mr. Patel serves as Chairman of the Board of Zydus and Mr. Roy serves on the Joint Steering Committee established by Cadila and Zydus and has made significant contributions to Zydus's business in Vermont; (2) both men traveled to Vermont to recruit Dr. Govil; and (3) both men conduct business at Zydus's South Burlington, Vermont facilities. First Am. Compl. ¶¶ 12–13. In their motion to dismiss, defendants Patel and Roy offer affidavits asserting that Mr. Patel has never been to Vermont, and that Mr. Roy has only been to Vermont once, in May 2008, after Dr. Govil had already left Mylan and joined Zydus. Defendants Patel and Roy maintain that these facts establish that neither of them traveled to Vermont to recruit Dr. Govil, and neither of them conducted business at the Zydus South Burlington office. That leaves Mylan's first point, which defendants Patel and Roy say is insufficient because (1) their corporate positions say nothing about their connections to Vermont and (2) their corporate positions do not relate to the subject matter of this action.

In opposition, Mylan concedes that Cadila's contacts with Vermont cannot be attributed to defendants Patel and Roy for the purposes of jurisdiction. E.g., *Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 617 (1st Cir. 1988) ("Jurisdiction over the individual officers or directors of a corporation cannot be imputed from jurisdiction over the corporation."). However, Mylan asserts that defendants Patel and Roy may be subject to personal jurisdiction in Vermont even if neither of them has ever been physically present here. See *N. Aircraft, Inc. v. Reed*, 154 Vt. 36, 44 (1990) (fact that defendant never traveled to Vermont and that his only contacts with Vermont were through the mail and by telephone was not determinative). Although it is now undisputed that neither Mr. Patel nor Mr. Roy ever physically traveled to Vermont to recruit Dr. Govil, the allegations of the complaint are that both men were involved in recruiting him from afar.

Mylan maintains that defendants Patel and Roy each purposely directed activities at Vermont, and Mylan's claim arises out of or relates to those activities. Specifically, Mylan says that Mr. Roy intentionally solicited Dr. Govil to enter into a joint venture

11

with Cadila, and that Mr. Patel was also involved in recruiting Dr. Govil. In reply, defendants Patel and Roy say that all of the contacts Mylan says they have with Vermont are attributable to *Cadila*—they are not the individuals' contacts. The problem with that argument is that Vermont has explicitly recognized (albeit in the context of liability rather than jurisdiction) "that a corporate officer may be held liable for a tort in which the officer *personally participated* even though the corporation may also be held liable." *Prive v. Vt. Asbestos Grp.*, 2010 VT 2, ¶ 17, 187 Vt. 280 (quoting *Agency of Natural Res. v. Upper Valley Reg'l Landfill Corp.*, 167 Vt. 228, 243 (1997)). Mylan's complaint alleges precisely that sort of personal participation. See First Am. Compl. ¶ 35 ("Upon information and belief, Patel and Roy actively solicited, recruited, and engaged with Govil in an effort [to] gain access to Plaintiffs' trade secrets and confidential information."). The Supreme Court has specifically rejected the argument that defendants Patel and Roy make: that any allegedly tortious action that is attributable to a corporation cannot also be attributed to a corporate officer. *Prive*, 2010 VT 2, ¶ 19.

## II. Reasonableness

All of the Indian defendants argue that, even if they have purposefully established minimum contacts with Vermont, exercising jurisdiction over them is not reasonable and will offend "traditional notions of fair play and substantial justice." See *N. Aircraft, Inc. v. Reed*, 154 Vt. 36, 42 (1990). In opposition, Mylan argues that asserting jurisdiction over the Indian defendants is reasonable and fair. In reply, Cadila asserts that the real reason Mylan seeks to include Cadila as a defendant is because Cadila represents a "deep pocket." Cadila says that has nothing to do with the reasonableness analysis. For their part, defendants Patel and Roy say that litigating this action in Vermont would impose an enormous burden on them, since they live and work in India. They also argue that Mylan can obtain convenient and effective relief without their presence.

A court conducting the reasonableness analysis must consider: "(1) 'the burden on the defendant'; (2) the forum state's interest; (3) 'the plaintiff's interest in obtaining relief'; (4) the interest of the interstate judicial system in efficiently resolving the controversy; and (5) 'the shared interest of the several States in furthering fundamental substantive social policies.'" *In re R.W.*, 2011 VT 124, ¶ 40, available at http://info.libraries.vermont.gov/supct/current/op2011-006.html (quoting *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987)). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

As to the first factor, the Indian defendants all maintain that the burden of litigating in Vermont is enormous for them. Mylan asserts that, given the conveniences of modern communication and transportation, the burden is not so great. Mylan also asserts that Cadila's burden is not as great as Cadila says, since Cadila has demonstrated that it can easily engage in a substantial business relationship with a Vermont company from across the globe. Notwithstanding modern communications and transportation, the

burden for an Indian corporation and Indian individuals to litigate in the United States is considerable. Still, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114. It is thus necessary to examine the remaining factors

The second factor is Vermont's interest as the forum state. The Indian defendants maintain that Vermont's interest in this case "begins and ends" with the activities of their Vermont co-defendants: Zydus and Dr. Govil. Here, the allegations of the complaint are that the Indian defendants intentionally made contacts with Vermont; therefore Vermont's interest does not "end" with what Zydus and Dr. Govil allegedly did. Vermont "has an important interest in protecting its citizens' intellectual property rights and business interests." *Real Good Toys, Inc. v. XL Mach. Ltd.*, 163 F. Supp. 2d 421, 425 (D. Vt. 2001); accord *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 724 (D.S.C. 2007) ("South Carolina has a substantial interest in adjudicating disputes between a domestic corporation and another corporation.").

The third factor is Mylan's interest in obtaining relief. Cadila says that Mylan can obtain convenient and effective relief by continuing the case against the non-Indian defendants (Zydus and Dr. Govil). Defendants Patel and Roy say that Mylan can obtain convenient and effective relief by going after Cadila and the other defendants. Mylan maintains its trade secrets have been misappropriated and disclosed by the Indian defendants as well as the original defendants, and without those defendants, Cadila would be free to use and commercialize the trade secrets it allegedly obtained. Although Cadila attacks two of the points Mylan makes in its opposition (namely, the court's grant of Mylan's motion to amend to add the Indian defendants and Cadila's deep pockets), it seems to ignore Mylan's main point: the Indian defendants now allegedly have Mylan's secrets, and Mylan will be injured unless any relief also binds the Indian defendants. That point is well-taken, and weighs in favor of Mylan.

With respect to factors four and five, the Indian defendants say that both factors are in their favor. Their main argument is that the norms and principles of international law counsel against exercising jurisdiction over foreign defendants who are located across the globe and who were never properly served with process and who have no genuine connections to Vermont. Mylan says that judicial economy favors addressing all of their claims in a single action. Mylan is correct as to the efficiency of handling all of the issues in a single case. The Indian defendants' arguments on factors four and five actually seem to be incorrect (the Indian defendants have now been properly served, and the above analysis indicates that they do have connections to Vermont) or a restatement of their argument on the first factor (it is undisputed that India is on the other side of the planet). In sum, this does not appear to be the kind of exceptional case where the minimum contacts test is met but where notions of fair play and substantial justice nevertheless make the exercise of personal jurisdiction unreasonable.

13

CONCLUSION

For the reasons discussed above, the court concludes that Mylan has met its burden of making a prima facie showing of specific personal jurisdiction over the corporate and individual Indian defendants.  The court will therefore deny the Indian defendants' motions to dismiss for lack of personal jurisdiction over them.

ORDER

Cadila's motion to dismiss for lack of personal jurisdiction (filed May 25, 2011) is denied.  Patel and Roy's motion to dismiss for lack of personal jurisdiction (filed May 25, 2011) is denied.

Dated at Burlington this ___ day of January 2012.

_____
Geoffrey W. Crawford
Superior Court Judge

14